**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| PRO MUSIC RIGHTS, LLC and SOSA ENTERTAINMENT LLC, | : <br> : <br> : |
| Plaintiffs, | : Civil Action No. 2:19-cv-00843 <br> : <br> : |
| v. | : <br> : <br> : |
| SPOTIFY AB, a Swedish Corporation; SPOTIFY USA, INC., a Delaware Corporation; SPOTIFY LIMITED, a United Kingdom Corporation; and SPOTIFY TECHNOLOGY S.A., a Luxembourg Corporation, | : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : |

**PLAINTIFFS' COMPLAINT WITH INJUNCTIVE RELIEF SOUGHT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs Pro Music Rights, LLC ("PMR"), which is a public performance rights organization representing over 2,000,000 works of artists, publishers, composers and songwriters, and Sosa Entertainment LLC ("Sosa"), which has not been paid for 550,000,000+ streams of music on the Spotify platform, file this Complaint seeking millions of dollars of damages against Defendants Spotify AB, Spotify USA, Inc., Spotify Limited, and Spotify Technology S.A. (collectively, "Spotify" or "Defendants"), alleging as follows:

**NATURE OF ACTION**

1.      Plaintiffs bring this action to redress substantial injuries Spotify caused by failing to fulfill its duties and obligations as a music streaming service, willfully removing content for anti-competitive reasons, engaging in unfair and deceptive business practices,

obliterating Plaintiffs' third-party contracts and expectations, refusing to pay owed royalties and publicly performing songs without license.

2.    In addition to live performances and social media engagement, Plaintiffs rely heavily on the streaming services of digital music service providers, such as and including Spotify, to organically build and maintain their businesses. "Streaming" refers to a method of delivering music without requiring the listener to download files onto the listener's device.

3.    Starting in or about May 2017, Spotify removed all of Plaintiffs' songs from its digital music streaming platform — commonly known as "Spotify" – without advance notice, without ever telling Plaintiffs why their songs were removed, without ever giving Plaintiffs an opportunity to address the issue, without ever providing Plaintiffs with an opportunity to cure whatever the reason for removal, and without adhering to the rules, procedures, policies and obligations to which Spotify holds itself out to the public.

4.    By doing that, Spotify acted deceptively and unfairly by not making *any* effort whatsoever to identify the origin(s) of the approximately 550,000,000 streams of Plaintiffs' songs before removing them — despite telling the Plaintiffs and the market that's what Spotify would do before removing streams from its platform. Nor did, worse yet, Spotify parse out which streams were played too much and which streams were not played enough.

5.    Plaintiffs' songs had to have genuine streams since Spotify added at least one of Plaintiffs' tracks onto a very popular, if not the most popular, Spotify-sponsored playlist in or about March 2017: "New Music Friday" which, at that time, had approximately 3,016,144 followers.

6.      As it knows and claims to do, Spotify is required to remit royalty payments to Plaintiffs for the streams of their songs and to obtain public performance licenses for the public performance of songs on its platform. To date, however, Spotify has not paid full royalties for the 550,000,000+ streams of Plaintiffs' songs on Spotify's service.

7.      Furthermore, Spotify did not remove just the songs that it may have guessed were played too much; rather, Spotify manually blanket-banned all of Plaintiffs' tracks without regard to any track-by-track analysis and then deliberately and maliciously blacklisted from its platform the Plaintiffs and their founder, Jake Noch, along with each and every single artist, composer, and writer associated with the Plaintiffs and Noch. All of the artists under Plaintiffs' umbrellas were deemed by Spotify guilty by association – in violation of the rules, procedures, policies and obligations to which Spotify holds itself out to the public.

8.      Spotify's motive for this aggressive action was directly tied to its equity deal with Music and Entertainment Rights Licensing Independent Network, B.V. d/b/a Merlin ("Merlin"), a global digital rights agency for the world's leading independent music companies.

9.      Sosa was a member of Merlin and, just prior to Spotify's removing all of Plaintiffs' content from Spotify's platform, Sosa had renewed its contract with Merlin, under which Spotify issued a material percentage of its equity to Merlin. By virtue of Sosa's membership with Merlin, Sosa was entitled under its contract with Merlin to receive equity in Spotify.

10.    The deal between Merlin and Spotify was announced by Spotify's Chief Executive Officer to the public via Twitter on April 20, 2017:



11.    Spotify's take-down of Plaintiffs' content was a bad faith tactic to exert pressure on Merlin to exclude Sosa from the equity participation, and Spotify was motivated by its maliciousness to cause Merlin to terminate its contract with Sosa. And it worked.

12.    Spotify's reasoning was that high stream counts from largely unknown, independent acts do not generate close to the same revenue for Spotify from advertisements as compared to mainstream acts and, as such, do not offset the royalties owed by Spotify for such streams.

13.    Moreover, Spotify told Merlin that 99% of the users responsible for the 550,000,000 streams of Sosa's songs were users of Spotify's ad-supported service (and not Spotify's subscription service which is Spotify's primary source of revenue and profit). As a result, hosting Plaintiffs' music for streaming by users of Spotify's free service had at the time, and would continue to have, dire financial consequences for Spotify.

14.    Spotify had every reason to tighten its financial belt. In its past four financial years (2015 – 2018), Spotify's cumulative annual net losses exceeded $2 billion dollars.

15.     In 2017, Spotify's IPO was on its horizon. Since Spotify's financials and forecasts would come under global scrutiny in its impending IPO, Spotify knew, or had reason to know, the tremendous growth of a non-mainstream label, such as Sosa, would further depress Spotify's financials and forecast in its IPO. Indeed, Spotify knew, or had reason to know, it would have to make, and would have to continue making, royalty payments to Sosa in the millions of dollars as Sosa's success continued to grow. Spotify's management, including its Chief Executive Officer, decided to be nimble and crafty to shore up its financials leading up to the IPO, and they did that by blanket-removing Plaintiffs and their repertoire of songs.

16.     So, Spotify invented a pretext to swiftly stem the bleeding caused by the users of Spotify's free service from playing Sosa's catchy songs.

17.     As a result of Spotify's discrimination and unlawful conduct against less established artists, Plaintiffs suffered massive losses. Merlin sold its Spotify shares shortly after Spotify went public on the New York Stock Exchange on April 3, 2018. Merlin allocated those proceeds, pro-rata, to its members, based on the value of Spotify royalties each member received during the period of Merlin's agreement with Spotify.

18.     Spotify had beaten the Plaintiffs: (i) Spotify fabricated a reason to remove Sosa's songs from its platform, (ii) Spotify removed those songs to avoid having to pay royalties for reasons having nothing to do with Sosa, (iii) Spotify communicated false statements to Merlin about Sosa, its songs, its artists, its members and its business, and (iv) Merlin, as a result of Spotify's false statements, wrongfully terminated its relationship with

Sosa. At the end of all this, Plaintiffs received nothing, but they should have received tens of millions of dollars through, among other things, Sosa's membership in Merlin.

19.    Spotify also engaged in a widespread smear campaign against Plaintiffs to prevent any of their music from being uploaded onto Spotify, or any other streaming platform, ever again.

20.    To add insult to injury, Spotify continues to unilaterally profit from Plaintiffs' music; despite purporting to remove Plaintiffs' content, some of Plaintiffs' music continues to stream without license via Spotify-generated playlist(s), and without any compensation made to copyright holders, in blatant disregard of the Copyright Act.  Spotify is legally obligated to pay royalties for streamed music.

21.    Given Spotify's unfair and deceptive practices, including being a notorious thief of copyrighted works without license, Spotify is liable to Plaintiffs for substantial damages.

## THE PARTIES

22.    Sosa is a limited liability company organized and existing under the laws of Florida with its principal place of business at 3811Airport Pulling, STE 203, Naples, Collier County, Florida 34105.  Sosa is a successful hip-hop record label, distributor, promotor and music publishing company, and it intended, as early as January 20, 2017, to expand into a digital distribution service (competitive to Spotify) and a marketing service. Sosa's artists and rightsholders have (i) collaborated with major artists on both mainstream and nonmainstream songs, (ii) had robust presence on social media platforms (including over 5 million combined followers), (iii) had a substantial number of streams on other platforms,

and (iv) had the songs to which they contributed content sell thousands of times. Sosa had songs in both mainstream and nonmainstream genres and sub-genres, such as pop, electronic, dance, including, without limitation, gangster rap, electronic dance hip-hop, drill music, EDM and dubstep. Sosa's sole member is a citizen and resident of the State of Florida.

23.    PMR is a limited liability company organized and existing under the laws of Florida with its principal place of business at 3811Airport Pulling, STE 203, Naples, Collier County, Florida 34105.  PMR is a for-profit performing rights organization that collects license fees on behalf of the artists, songwriters, composers, music publishers and other rightsholders with whom it is affiliated and then distributes the license fees as royalties to those affiliates whose works have been publicly performed. It is the fifth ever formed public performance rights organization in the United States (behind BMI, ASCAP, SESAC and GMR) with an estimated 7.4% market share based on the approximately 2,000,000 works in its repertory.  PMR's sole member is a citizen and resident of the State of Florida.

24.    PMR has a number of reputable artists in its cache including, OG Maco, best known for his 2014 debut single "U Guessed It," which went viral and peaked at number 90 on the U.S. Billboard Hot 100.  OG Maco, among others, have an exclusive relationship with PMR.

25.    PMR has been granted the right to license the public performance rights in approximately two million (2,000,000) copyrighted musical works ("Sosa's Repertoire"), including those which are alleged herein to have been wrongfully taken down from Spotify's service and otherwise infringed by Spotify. Some of those works feature notable artists such as A$AP Rocky, Wiz Khalifa, Pharrell, Young Jeezy, Juelz Santana, Lil Yachty,

MoneyBaggYo, Larry June, Trae Pound, Sause Walka, Trae Tha Truth, Sosamann, Soulja Boy, Lex Luger, Lud Foe, SlowBucks, Gunplay, OG Maco, Rich The Kid, Fat Trel, Young Scooter, Nipsey Hussle, Famous Dex, Boosie Badazz, Shy Glizzy, 2 Chainz, Migos, Gucci Mane, Rich The Kid, Young Dolph, Trinidad James and Fall Out Boy.

26.     Plaintiffs own the copyrights and/or have sufficient exclusive rights with respect to the works in Sosa's Repertoire.

27.     Jake Noch ("Noch"), a musical prodigy, is the founder, Chief Executive Officer and sole owner of Sosa and PMR. Noch founded Sosa at the age of sixteen and PMR when he was twenty years old.

28.     Spotify considers the individual, Noch, and the entities, Sosa and PMR, to be one in the same, such that it applied a blanket ban on its service to all three and advised others to blacklist them by spreading false statements of fact.

29.     Upon information and belief, Defendant Spotify Technology S.A. is a business entity incorporated in Luxembourg, having its principal place of business at Avenue Marie-Therese 22, 2132 Luxembourg, Luxembourg.

30.     Upon information and belief, Defendant Spotify Limited is a Private Limited Company organized under the laws of the United Kingdom, having its principal place of business at Golden House, 30 Great Pulteney Street, London W1F 9NN, United Kingdom. Upon information and belief, Spotify Limited is a wholly owned subsidiary of Spotify Technology SA.

31.     Upon information and belief, Defendant Spotify AB, is a Swedish corporation with its principal place of business at Birger Jarlsgatan 61, 4tr 113 56 Stockholm, Sweden.

Upon information and belief, Spotify AB is a wholly owned subsidiary of Spotify Limited.

32.     Upon information and belief, Defendant Spotify USA, Inc., is, inter alia, a Delaware corporation engaged in online music distribution with a place of business at 1221 Brickell Ave, Miami, Florida. Upon information and belief, Spotify USA, Inc., is a wholly owned subsidiary of Spotify Limited.

33.     At all relevant times, each of Defendant Spotify Technology S.A., Spotify USA, Inc., Spotify AB and Spotify Limited, and their respective representatives, conspired with, and acted as agents on behalf of and for, the other defendants with respect to the actions and inactions alleged in this Complaint.

34.     Spotify touts itself as the largest global music streaming subscription service. With a presence in 61 countries and territories and growing, its platform includes 159 million monthly active users and 71 million premium subscribers, as of December 31, 2017, which Spotify believes is nearly double the scale of its closest competitor, Apple Music. According to Spotify, its "users are highly engaged."

35.     Upon information and belief, at all times material hereto, Defendants operated through the acts of their employees, agents, representatives, servants, and the like, acting within the course of their employment and scope of duties.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338, 17 U.S.C. § 501, 15 U.S.C. § 1121, and under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

37.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400.

38.     Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

39.     Additionally, venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and (c) because Defendants' contacts would be, and are, sufficient to subject them to personal jurisdiction in this district.

40.     Spotify provides its interactive streaming service and platform to individuals located in Florida and Florida residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

41.     On information and belief, Spotify AB is the owner of the www.spotify.com website and the Spotify mobile application available for download on the Apple store and the Google Play store, in both instances, from which individuals in this district can sign up for, download and use Spotify's interactive streaming service.

42.     Upon information and belief, Spotify has thousands of registered subscription-based users and free-based users in Florida.

43.     The musical works involved in this action have been streamed throughout Florida.

44.     In addition to employing Florida residents in its Miami corporate office, Spotify advertises, solicits clients, and conducts substantial amounts of business in the state of Florida and within this district.

45.     Plaintiffs have the right to bring the within action pursuant to 17 U.S.C. §

501(b).

46.     The copyright in every musical work at issue was registered in the United States Copyright Office and otherwise satisfies the Copyright Act. 17 U.S.C. §§ 409-412.

## FACTS

A.     SPOTIFY HAS AN ANTI-COMPETITIVE INCENTIVE TO DAMAGE SOSA AND PMR BECAUSE NON-MAINSTREAM ARTISTS ARE NOT FINANCIALLY ACCRETIVE TO SPOTIFY

47.     Spotify generates revenues through both a free advertisement-supported tier ("Advertising Tier") and a paid subscription premium tier. The former allows users, at no cost, to play music from Spotify's catalog on-demand with ad interruptions. Advertisers pay money to Spotify for exposure, which, in turn, funds the royalties Spotify is required to pay out to artists. The latter provides for ad-free music listening for a fee.

48.     As of December 31, 2016, Spotify had approximately 123,000,000 monthly active users, of which approximately 77,000,000 users access the platform through the Advertising Tier. As of December 31, 2017, Spotify had approximately 159,000,000 monthly active users, of which approximately 92,000,000 users access the platform through the Advertising Tier.

49.     As of December 31, 2016, Spotify's users consumed audio and video content aggregating 26,700,000,000 hours. As of December 31, 2017, Spotify's users consumed audio and video content aggregating 40,300,000,000 hours.

50.     As of December 31, 2016, Spotify generated approximately ten percent (10%) —€295,000,000 of its €2,952,000,000 of gross revenue — from advertisement revenue on its Advertising Tier. It cost Spotify €330,000,000 to generate €295,000,000 of advertising

revenue on its Advertising Tier.

51.     As of December 31, 2017, Spotify generated ten percent (10%) —
approximately €416,000,000 of its €4,090,000,000 of gross revenue — from advertisement
revenue on its Advertising Tier. It cost Spotify €373,000,000 to generate €416,000,000 of
advertising revenue on its Advertising Tier. For the year ended December 31, 2017 as
compared to 2016, Advertising Tier gross loss changed by €78 million to a gross profit of
€43 million.

52.     From 2016-2017, revenue from Advertising Tier represented approximately
10% of Spotify's total revenue.

53.     Spotify typically experiences a seasonal decline in advertising revenue due to
reduced advertiser demand in the first quarter of calendar years. Revenues for the
Advertising Tier increased in each fiscal quarter in 2016 and 2017, with the exception of a
decrease in the quarter ending March 31, 2017.

54.     Spotify recorded a charge of €8,000,000 on its financials in the first quarter of
2017 as a result of, upon information and belief, its dispute with Sosa.

55.     The Advertising Tier has no subscription fees and provides its users with
limited on-demand online access to Spotify's catalog on computers and tablets and shuffle-
only access (i.e., without being able to specifically select a track) on compatible mobile
devices. The Advertising Tier is a robust option for users wanting to enjoy access to a wide
variety of music and other content.

56.     Spotify generates revenue for the Advertising Tier from the sale of display,
audio, and video advertising delivered through advertising impressions. Spotify generally

enters into arrangements with advertising agencies that purchase advertising on its platform on behalf of the agencies' clients. These advertising arrangements typically specify the type of advertising product, pricing, insertion dates, and number of impressions in a stated period. Revenue for its Advertising Tier segment is comprised primarily of the number and hours of engagement of its and Spotify's ability to provide innovative advertising products that are relevant to its users. Spotify's advertising strategy centers on its belief that advertising products that are based in music and are relevant to its users can provide even greater returns for advertisers.

57.     Spotify focuses on analytics and measurement tools to evaluate, demonstrate, and improve the effectiveness of advertising campaigns on its platform, including the Advertisement Tier.

58.     Revenue from the Advertisement Tier is impacted by the demographic profile of Spotify's users, its ability to enable advertisers to reach the target audience with relevant advertising and in relevant geographic markets.

59.     A large percentage of Spotify's users of the Advertisement Tier are between 18 and 34 years old. Spotify believes this is a highly sought-after demographic that has traditionally been difficult for advertisers to reach. By offering advertisers increased "self-serve options," Spotify expects to improve the efficiency and scalability of its advertising platform.

60.     Additionally, Spotify believes that its largest markets, including Europe and North America, are among the top advertising markets globally.

61.     Spotify continues to invest in its advertising products on the Advertising Tier

in order to create more value for its advertisers and the users of the Advertising Tier. Spotify continues to enhance its ability to make advertising content more relevant for the users of the Advertising Tier.

62.     Offering advertisers additional ways to purchase advertising on a programmatic basis is one example of how Spotify continues to expand its portfolio of advertising products. Spotify is also focused on developing analytics and measurement tools to evaluate, demonstrate, and improve the effectiveness of advertising campaigns on its platform.

63.     Spotify has incurred, and continues to incur, significant costs to license content and pay royalties to music labels, publishers, and other copyright owners for such content. Spotify has refused to assure its investors, however, that it will generate sufficient revenue, including from its Advertising Tier, to offset the cost of licensing content and paying royalties. Spotify has warned potential investors that if it cannot successfully earn revenue at a rate that exceeds its operational costs, including royalty expenses, associated with its platform, Spotify will not be able to achieve or sustain profitability or generate positive cash flow on a sustained basis.

64.     In 2018, Brian Benedik, Global Head of Advertising at Spotify, admitted that Spotify is focused on driving revenues through advertising: "the self-serve tool Ad Studio that allows smaller businesses to activate the Spotify free audience is a big growth area for us, and is going to be a very big part of what we do in the years to come." Spotify's self-serve advertising tool was not available until 2018.

65.     Prior to the availability of Spotify's self-serve advertising tool, Spotify

14

required advertisers to commit to a $25,000 advertising budget, which required direct interface with Spotify's advertising department. In other words, an advertiser could not create its own campaign without communicating directly with a Spotify employee. At various times, Plaintiffs ran advertising campaigns within Spotify.

66.     Targeting of mainstream artists commands higher advertising fees on the Advertising Tier.

67.     To achieve maximum exposure, companies with larger marketing budgets generally target the songs of mainstream artists like Ed Sheeran, Drake and Ariana Grande due to their large fan bases.

68.     Spotify recoups royalty payments resulting from the streams of established artists by generating advertisement revenue.

69.     Spotify's circular flow of money business model fails when lesser known artists experience streams on the same level as those of well-known artists.

70.     Spotify hopes that independent acts do not grow into established artists while having had uploaded its initial songs to its platform.

71.     Spotify does not uniformly enforce its content removal rules, procedures, policies and obligations to which Spotify holds itself out to the public.  In fact, Spotify's rules, procedures, policies and obligations are not even internally consistent, meaning Spotify disregards provisions thereof when it benefits Spotify.

72.     Upon information and belief, Spotify's algorithm or system that detected whatever it detected against Sosa was applied inconsistently, if at all, between and among mainstream and nonmainstream artists.

73.     Indeed, Spotify's Compliance Team admits in writing that its fraud detection team takes down tracks of mainly non-mainstream artists and of those whose songs are being played too much.

74.     Since advertisers were not paying Spotify to market the fans of Plaintiffs' artists, Sosa's Repertoire, with its high stream volumes, was simply costing Spotify too much money.

75.     Something had to be done, particularly in light of the impending equity deal Spotify was negotiating with Merlin, of which Sosa was a member.

76.     The quick and easy solution: ban Sosa's Repertoire from Spotify's platform, which Spotify did — and then lie about it.

77.     Notably, upon information and belief, Spotify never deactivated, removed or banned the users who streamed Plaintiffs' music and who, if what Spotify says is true, were the actual violators of Spotify's rules, procedures, policies and obligations to which Spotify holds itself out to the public. That's because Spotify derives value from touting the number of users it has on its platform. Removing a substantial number of users from its Advertising Tier in one fell swoop would have cataclysmic effects on Spotify's financial statements, financial forecasts and financial outlook for its then fast-approaching IPO. Indeed, Spotify's documents publicly-filed with the Securities and Exchange Commission heavily rely on and focus on the growth of Spotify's userbase, both of the Advertising Tier and the paid-subscription tier.

78.     In sum, Spotify had an anti-competitive, economic motivation to eliminate Plaintiffs' music from its platform, including to prevent Sosa from deploying and otherwise

gaining traction on its digital distribution service.

**B.     SPOTIFY TARGETED SOSA**

79.     Prior to entering into an agreement with Merlin on February 13, 2017 (the "Merlin Membership Agreement"), Sosa entered into an agreement with Independent IP B.V. and IIP-DDS B.V. (together, "Fuga") under which Fuga would distribute and promote Sosa's works on and to digital music streaming services, including Spotify. Both the Merlin Membership Agreement and the agreement with Fuga resulted in Sosa's works being uploaded to Spotify, along with other streaming platforms, in order to enable consumers to listen to those recordings.

80.     Prior to the Merlin Membership Agreement, Sosa's songs that were uploaded to Spotify by Fuga had been experiencing solid growth. To expand the fan-following of its artists, Sosa engaged (just like any music label would do) in a substantial marketing campaign. It spent at least $5,000 on press releases covering its artists, songs and business. It engaged in multi-hundred-dollar radio campaigns for various of its albums, EP and singles. All in all, Sosa incurred at least $25,000 of marketing expenses in or about early 2017. Sosa did that because, around the time of the Merlin Membership Agreement, it had increased the number of albums it was releasing from a couple albums a month to approximately a hundred or so albums in a two-month period.

81.     The late 2016 through early 2017 time period was a critical growth period for Sosa: it was signing more artists, releasing more songs, singles and albums, and improving its numbers on a consistent monthly basis. There were no significant or sudden spikes in Sosa's streaming (up or down) that would have prompted Spotify to suddenly treat Sosa any

differently once Sosa signed the Merlin Membership Agreement. Sosa's streaming activity was not abnormal to Sosa, and its growth was escalating at an optimistic rate leading up to and after the Merlin Membership Agreement.

82.    Something changed once Sosa joined Merlin, which is a more substantial market participant and source of music on Spotify, as compared to Fuga. But, while Sosa was affiliated with Fuga, Spotify paid most, if not all, the royalties arising from streams of Sosa's at least 4,264 songs that Fuga uploaded to Spotify – and that remained on Spotify after the Merline Membership Agreement. For example, on or about May 20, 2017, Spotify paid Sosa approximately €26,641.67 of royalties for approximately 15,000,000 streams occurring in March 2017. Spotify never communicated any issue with those streams, when Sosa was only generating €26,641.67 worth of royalties. Nor did Spotify raise any issue with Sosa's streams when it paid Sosa €7,643.08 for streams occurring from November 2016 up through and including February 4, 2017.  By paying royalties on those streams, Spotify admitted they were legitimate plays.

83.    All in all, Sosa's songs were streamed on Spotify by both Advertising Tier and paid-subscription tier users in various countries, such as, for example, Denmark, United States, Canada, Paraguay, Brazil, Spain, France, United Kingdom, Ireland, Sweden, Finland, Australia, Mexico, Austria, Malaysia, Netherlands, Chile, Italy, Hungary, and Belgium. With such worldwide reach, Sosa's was poised to become a major label.

84.    Plainly, Sosa experienced over 300% growth in royalty payments during that period. Sosa continued to grow exponentially because of Sosa's social media and traditional marketing efforts and Sosa's release of over 100 albums and tens of thousands of songs in

2017, in each instance, because Sosa engaged in a targeted media campaign recognizing that most of its potential fans or listeners would not have sufficient monthly, disposable income to listen to Sosa's songs on anything but the Advertising Tier. Sosa's niche-marketing strategy paid off. Upon information and belief, Sosa was able to drive listeners of its songs to Spotify's platform through the Advertising Tier. And, one of Sosa's now-former artists was listed on the Billboard Top 100 catalog.

85.     What was more promising for Sosa is that the music press was starting to cover Sosa's artists and growth: thousands of articles were being written about it, including on such websites as xxlmag.com, kollegekidd.com, thisis50.com and worldstarhiphip.com. While Sosa's social media and marketing campaign were starting to pay dividends for Sosa, Spotify realized Sosa's growth would cause negative consequences, particularly in its IPO.

86.     So, Spotify targeted Sosa because Spotify got wind from Merlin that Sosa had opted-in to the Merlin-Spotify Deal Renewal dated February 20, 2017, which provided Sosa with a right for an equity share in Spotify proportionate to royalties earned. At the rate of Sosa's growth, Sosa would have received a significant share of Spotify's equity.

87.     Spotify devised a plan to avoid having to compensate Sosa.

88.     It immediately told Merlin that Sosa's songs were being streamed too much, added a provision addressing manipulation to an updated Merlin-Spotify Deal Renewal dated April 10, 2017, and made various false and misleading statements of fact — that Sosa had engaged in fraudulent activity — to Merlin.

89.     On April 20, 2017, before Noch had an opportunity to negotiate the terms of the updated Merlin-Spotify Deal Renewal, the Chief Executive Officer of Spotify, Daniel Ek, announced a new, multi-year deal with Merlin on Twitter, thereby sealing Sosa's fate.

90.     On April 24, 2017, Noch requested that Merlin remove Spotify's policy regarding manipulation of streams and charts from the updated Merlin-Spotify Deal Renewal, to which Merlin responded that it was "not able to renegotiate the agreement with Spotify."

91.     Noch, knowing that Plaintiffs had not engaged in any fraud, then pressed for a provision enabling Sosa to dispute any such claims and to have any investigation performed by a neutral third party. Merlin attempted to obtain information from Spotify, but Spotify initially refused to provide any information.

92.     In an e-mail dated April 25, 2017, Merlin advised Noch that Spotify's invocation of the removal policy "has been an extremely rare event during the close to nine years we have been in business with them, we have the opportunity to dispute what they are saying. If any dispute became seriously contentious then it would if necessary ultimately be determined by a third party."

93.     Spotify refused to permit Sosa to dispute the removal and/or engage the services of a neutral third party to conduct an investigation into whatever grounds may exist for removal.

C.     **SPOTIFY BLANKET-BANNED SOSA'S REPERTOIRE FROM BEING DISPLAYED ON SPOTIFY'S PLATFORM, RESULTING IN DAMAGES TO PLAINTIFFS.**

94.     Spotify is the world's biggest music streaming platform by number of subscribers.

95.     For artists, producers and publishers of music seeking to obtain the widest possible audience for their songs, the use of Spotify's platform is an economic and competitive necessity. This is especially true for non-mainstream artists, some of whom include Plaintiffs' clients, looking to gain traction in the global market in which Spotify's platform is available.

96.     Spotify machine-generates editorially curated playlists using artificial intelligence and machine learning capabilities to find, promote and program songs whether they are established hits or "hidden gems."

97.     Spotify's intent is to enable users to find "great content" that is personalized for them, but that may not be currently in their personal libraries or at the top of the charts.

98.     Spotify considered one of Sosa's tracks to be "great content" when it unilaterally added the track to one of Spotify's biggest (if not *the* biggest) playlist in 2017, "New Music Friday", with a total subscriber count of 3,016,144.  Sosa's track reached a peak position of No. 83 on that global playlist.

99.     Spotify's placement of Sosa's track on a very popular playlist easily explains one reason why a nonmainstream artist might experience high volume streaming for his or her music. Spotify recognizes the value of being placed on its playlists, stating "Given the success of our playlists in driving music discovery, they have become one of the primary tools that labels, artists, and managers use in order to boost artists and measure success" and "We believe that we are uniquely positioned to help artists reach their full potential."

100.    There had to have been genuine streams of Plaintiffs' songs by virtue of the fact that tracks were on Spotify playlists, including one of the most popular Spotify-

generated playlists.

101.    Another reason for seemingly sudden and/or unexpected interest (from Spotify's point of view) in a nonmainstream artist is if that artist engaged in a blitz campaign.

102.    While Spotify benefited from Spotify's push, Sosa did not. Sosa became too successful, and too quickly, such that Spotify needed to immediately dial back on its promotion of "hidden gems."

103.    On March 28, 2017, via e-mail, Spotify notified Sosa that certain works in Sosa's Repertoire had been taken down from Spotify's platform because the content had been identified as "abnormal streaming activity," which means that the songs were played too much. Spotify stated that any streams of the works would be excluded from royalty calculations and financial statements for the month of March 2017.

104.    Nowhere, in its March 28, 2017 email to Sosa, did Spotify discuss the factual basis that led to its takedown of Sosa's Repertoire. More specifically, Spotify did not discuss or produce any evidence (i) that an alleged violation of abnormal streaming had occurred, (ii) what period of time the alleged violation had occurred, or (iii) what led Spotify to believe that it was Sosa or one of its agents that had violated Spotify's policy.

105.    Spotify promulgates rules, procedures, policies and obligations to which Spotify holds itself out to the public that purportedly describe basic standards for content provided to Spotify and on how and why Spotify removes content — just content, and not anything or anyone else – from its service.

106.    Spotify alleged that Plaintiffs violated agreements and/or policies addressing "abnormal streaming activity."

107.    "Abnormal streaming activity" is a term coined and defined by Spotify.

108.    Spotify determines "abnormal streaming activity" based on the decision it wants to reach and the target of the communication and/or investigatory façade. In one communication, Spotify says it considers the following factors in making a removal decision:

- Number of streams the album received in the past week;
- Number of users who stream the album;
- Total number of streams / Total number of users who stream the track;
- Number of tracks on the album;
- Number of "short length" tracks on the album (< 60 seconds);
- Number of "short length" streams on the album (< 60 seconds);
- Territorial activity;
- Whether the artist or label has a "small" following on social media;
- Whether the artist or label has "low" view counts on Youtube;
- Whether the artist conducts live performances;
- Whether the streams were generated from a Spotify-controlled playlist.

109.    In another communication, Spotify limited the factors to:

- Number of streams the album received in the past week;
- Number of users who stream the album;
- Total number of streams / Total number of users who stream the track;
- Number of tracks on the album;
- Number of "short length" tracks on the album (< 60 seconds);
- Number of "short length" streams on the album (< 60 seconds);
- Territorial activity.

110.    In yet another communication, Spotify all-out changes the factors to determine not whether songs have "abnormal streaming activity" but whether there is "inorganic user patterns":

- Whether the total streams originate from Spotify's free service or paid service;
- Whether the "vast majority of streams" link back to "new user accounts";
- Whether the "listening pattern" of those "new user accounts" is "completely abnormal";
- Whether songs "accumulated huge numbers of streams in an incredibly short period" from "new user accounts".

111.    In yet another communication, Spotify, again, all-out changes the factors to verify whether a "track's latest plays" are "real and eligible":

- Whether nonmainstream artists are getting "lots of streams per day (between 3,000 – 10,000 streams per day).

112.    Spotify's policy changes without notice, and its changing of factors demonstrate Spotify's deceptiveness and unfairness in removing content. But, removing content is one thing. Spotify never tells the market, nor did it tell Sosa, that it would or could remove albums, artists, labels, and songs having no removal factors linked to them.

113.    Upon information and belief, the 550,000,000 streams at issue originated from a diverse set of user accounts, including user accounts that stream by virtue of playlists, including Spotify-generated playlists.

114.    Spotify did not identify to Plaintiffs the party or parties responsible (or at least not responsible) for driving the plays like it did for at least one other alleged offender and which, upon information and belief, it has done for other alleged offenders. In another circumstance, internal Spotify emails obtained by the Plaintiffs show that the Spotify Compliance Team *apologized* for taking down a track, even though the Spotify Compliance Team said, in the same email, that the latest plays of that track were found to be fraudulent. Even after Spotify's Compliance Team found streams to be fraudulent, the Spotify Compliance Team authorized the re-uploading of the track onto Spotify's platform — which is not how Spotify treated the Plaintiffs.

115.    Spotify's determining not to remove a track where the artist was unconnected to the offending user or the fraud makes sense since competitors could sabotage each other

by engaging in artificial streaming of a rival's music. Digital streaming wars might ensue if Spotify blacklisted a track, artist and/or label in that context.

116.    But, Spotify has not produced any evidence to connect Sosa to the allegedly offending users.

117.    Spotify made this gigantic leap in logic with respect to Sosa.

118.    In or around May 2017, without further notice to Sosa, Spotify abruptly removed the entirety of Sosa's Repertoire on the basis of the alleged fraudulent activity. The accusation is false. At no time has Sosa or any agent thereof abused Spotify's platform nor has Sosa incited third parties to abuse Spotify's platform.

119.    Upon information and belief, the content of each musical work was not individually reviewed and evaluated by Spotify prior to Spotify's decision to ban Sosa's Repertoire.

120.    Upon information and belief, Spotify did not parse out the allegedly inflated streams from the non-inflated streams.

121.    Instead of removing the relevant tracks, Spotify removed all of the tracks in Sosa's Repertoire, whether or not the track was artificially streamed and tied the withholding of royalties to the artists and their record label - not just the streams.

122.    Spotify's punishment was excessive, inappropriate and unlawful.

123.    As a result of Spotify's decision to blanket ban Sosa's Repertoire, Sosa's works cannot be located on the world's most widely used music streaming platform, Spotify.com.

124.    Spotify's removal of Sosa's Repertoire has severely hindered Plaintiffs'

business partners and consumers of its music from locating and listening to Sosa's works.

125.    In addition, Plaintiffs cannot now cause *any* music to be uploaded to Spotify.com solely because of the new works' affiliation with them.

126.    Spotify has treated Plaintiffs differently and inconsistently from other users, labels, and performing rights organizations, and also maintains practices and policies to inconsistently and irreconcilably apply its rules, procedures, policies and obligations to which Spotify holds itself out to the public in a unlawful, discriminatory, unfair and deceptive manner, including with respect to removing content, individuals and companies from its platform by, for example, (i) not taking any action against the user accounts responsible for any alleged misconduct, (ii) removing songs streamed by unaffiliated user accounts, (iii) removing albums the songs of which were streamed by unaffiliated user accounts, (iv) removing artists the songs of whom were streamed by unaffiliated user accounts, (v) removing labels the songs of which were streamed by unaffiliated user accounts.

127.    Additionally, Spotify is aware of, and allows, various individuals, companies and businesses to sell "plays" or "streams" to artists on Spotify so that Spotify can report to the investing public an increase in various statistics, including "plays" and "streams."

128.    Spotify's removal decision caused, and continues to cause, irreparable harm and significant damage to Plaintiffs.

**D.     SPOTIFY'S PUBLISHED STATEMENTS ARE INCONSISTENT WITH SPOTIFY'S CONDUCT.**

129.    Spotify admits that content or material on its service is the property of either Spotify or Spotify's licensors.

130.    Spotify informs users that violation of its public-facing agreements *may* result in immediate termination or suspension of the user's Spotify ***account***.

131.    Nowhere in the guidelines, or in any other publication, does Spotify ever indicate that it will "ban" a user, music label, publisher or performing rights organization or take punitive action by completely removing from its platform every musical work affiliated or associated with that individual or entity.

132.    Nowhere in the guidelines, or in any other publication, does Spotify ever indicate that it will remove content for anti-competitive reasons.

133.    To the contrary, Spotify's rules, procedures, policies and obligations to which Spotify holds itself out to the public are informative of how Spotify takes a neutral approach and only removes content for engaging in very specific activities, which do not include any activities engaged in by Plaintiffs.

134.    In fact, Spotify attempts to avoid any responsibility for the content by stating that "Spotify has no responsibility for your choices to post material on the Service."

135.    Merlin informed Noch that, in its experience, the removal of content by Spotify was an extremely rare event.

136.    Spotify's statements to the public, its business partners and Plaintiffs were false, deceptive and misleading, because they are inconsistent with the conduct Spotify demonstrated in this case.

137.    All of Spotify's published statements state that Spotify will only remove content based upon that content falling within certain limited exceptions, but here, Spotify removed all of Sosa's music solely based upon the works' affiliation with Plaintiffs.

138.   Upon information and belief, Spotify acted against Plaintiffs for anticompetitive reasons and to punish Plaintiffs for engaging in what it has unilaterally labeled as "artificial streams," and not based on the content of each individual work.

139.   Additionally, Spotify's conduct *after* the total ban of Sosa's Repertoire was inconsistent with Spotify's statements to the public, as Spotify continued to play Plaintiffs' music, without authorization and without payment.

E.   **SPOTIFY DEFAMED PLAINTIFFS TO THEIR FINANCIAL DETRIMENT**

140.   Spotify willfully and maliciously extended its blacklisting of Plaintiffs to music distribution companies and aggregation service providers associated with them.

141.   Spotify took deliberate action to spread the word globally that Plaintiffs had engaged in fraudulent activity to their business partners including, but not limited to, Merlin, DiGIDI, a distributor of digital music, FUGA, a digital music aggregator, Artist Without A Label ("AWAL"), a distributor of digital music, and Universal Music Group ("UMG"), one of the "Big Three" music companies, with the explicit intention of ruining those relationships.

142.   Spotify realized its effectuated goal for Plaintiffs to cease doing business with music streaming platforms.

143.   Spotify's false statements about Plaintiffs had the intended domino effect whereby recipients of the allegations failed to follow through with their respective contractual obligations to distribute Sosa's Repertoire and/or collect royalties from streaming platforms.

144.   Sosa never "opted out" by the March 6, 2017 deadline of the initial Spotify

28

Deal Renewal dated February 20, 2017, therefore, it remains in full force and effect pursuant to Section 2.4 of the Merlin Membership Agreement.

145.   Merlin was, and still is, contractually obliged to collect royalties and to continue to pay for the sub-licensing of musical works from Sosa's Repertoire to streaming platforms, including Spotify.

146.   In or around April 2017, Merlin informed Sosa that Spotify was refusing to pay out further royalties to Merlin for the benefit of Sosa. The reason given was that Spotify believed that the number of streams by Sosa artists was disproportionately high; and, according to Spotify, this could only be explained by the number of streams somehow being manipulated. More specifically, there would have been so-called bots that – somewhere in the world – would have automatically clicked on certain tracks in order to artificially increase the number of paid streams.

147.   On May 25, 2017, Merlin, in reliance on Spotify's false and defamatory statements about Sosa, terminated the Merlin Membership Agreement with Sosa and ceased its licensing of Sosa's works. Merlin informed Sosa that Merlin would be sending requests to multiple streaming platforms advising them to take down Sosa's Repertoire as soon as possible as a result of Spotify's false and defamatory statements about Sosa. Those streaming platforms included Akazoo, AWA, Deezer, Electric Jukebox, Flipagram, Google Play, iam+ Dial, iHeart, KKBOX, Pandora, Pulselocker, Saavn, Slacker, SoundCloud, UMA, Vevo, WEYV and Yonder.

148.   Upon information and belief, Merlin e-mailed each of those streaming platforms stating that Sosa had engaged in fraudulent streaming activity and advising

removal of Sosa's Repertoire from each respective platform.

149.    As a result of Merlin's sudden and irregular termination of the agreement, Sosa suffered and continues to suffer losses in the amount of millions of dollars in lost royalties not only from those streams by Spotify, but also from other platforms affiliated with Merlin.

150.    Spotify did not stop its disruptive influence with Merlin. In an e-mail dated November 30, 2017, Spotify informed a label affiliated with UMG that multiple Sosa artists had engaged in streaming fraud and that it had blocked Sosa's content. Spotify took it a step further and encouraged that label to also block Sosa's content.

151.    An e-mail from AWAL to Noch dated November 30, 2017, reported that Spotify had informed AWAL that it had detected abnormal streaming activity on content provided by Noch and that all of the content would need to be taken down.

152.    An e-mail from Ampsuite, a music distribution company, to Noch dated September 19, 2018 revealed that FUGA had made both Ampsuite and iTunes aware of its reason for terminating Sosa's account.

153.    In an e-mail from Sugo Music Group ("Sugo"), a music distribution company, to Noch dated October 17, 2018, forwarding a message from FUGA blacklisting Noch, Sosa and Pro Music Rights, Sugo informed Noch that it would not be able to provide distribution services because Sugo's aggregation service provider was FUGA.

154.    In an e-mail from DiGIDi to Noch dated September 24, 2019, DiGIDi stated the following:

> DiGIDi has today received an official warning from Spotify.
> You are under suspicion of fraud.

We have therefore ordered immediate 'take down' of all content that have been delivered from you.
We will investigate this closer and withhold any payments until we have more detailed information from Spotify.
There is no way you can change this decision, so please do not try to contact DiGIDi until further notice.

155.   Specifically, Spotify told DiGIDi that recordings delivered by Noch's label breached various sections of Spotify's Infringement guidelines; that Spotify was applying multiple strikes to the content; that Spotify expected DiGIDi to immediately cease any delivery of content from Noch's label and the individuals behind it; that Spotify had detected multiple attempts of artificial manipulation of streams related to multiple artists via Noch's label in the past; that Spotify had previously removed content associated with Noch's label; that Noch's label and its associated artists had exceeded strike limits through other providers; and that Noch's label had been suspended from Spotify indefinitely.

156.   Spotify urged DiGIDi to help Spotify enforce its guidelines.

157.   Spotify told UMG, on or about November 30, 2017, that it had previously issued three strikes to "this label", referring to Sosa. That statement is false and misleading.

**F. SPOTIFY WILLFULLY INFRINGED COPYRIGHTS**

158.   With no assets other than the recordings of musical works made available to stream on demand to consumers on its digital platform, Spotify has nonetheless built a company now valued at $28 billion with its stock currently trading on the New York Stock Exchange.

159.   Spotify's marketing tagline, which is prominently displayed on its website home page states, in part, "Millions of songs."

160.   The number of available musical works positively correlates with Spotify's

market value as well as revenues derived from advertising and paid subscribers.

161.    The largest possible catalogue ensures that Spotify remains competitive amongst rival digital music streaming services.

162.    Toward that end, Spotify's internet website (www.spotify.com) invites artists, distributors, and record labels working with distributors, to upload music and other sounds, podcasts, videos, text, photos and artwork for viewing by the general public.

163.    Pursuant to the Copyright Act, musical works appearing on the Spotify service must be properly licensed and appropriate royalties must be paid to copyright owners.

164.    Spotify has a copyright policy which states that it will "terminate in appropriate circumstances the accounts of subscribers who are repeat infringers." Yet, Spotify does not apply the same standard to itself.

165.    Upon information and belief, a number of major record labels, including Sony Music, UMG, Warner Music and EMI, allowed Spotify to use their sound recordings in exchange for being allowed to purchase a stake in Spotify at below market value. In some cases, equity in Spotify was provided to sound recording rights holders for no additional compensation. As a result of these deals, upon information and belief, the major record labels own an approximate sixteen percent (16%) stake in Spotify. With a successful Spotify public offering, the stake allows the labels to potentially generate billions of dollars, none of which they need to share with the copyright creators, performing artists or songwriters. As a result, there is an incentive for such record labels to turn a blind eye to Spotify's rampant copyright infringement.

166.    This collusion between Spotify and major record labels hinders the livelihood

of performers, songwriters, publishers and the music community as a whole.

167.   Sosa and PMR seek to remedy, at least in part, the wrongful nonpayment of public performance royalties owed by Spotify to legally entitled right holders.

168.   Just as Spotify did with the major record labels, Spotify made a business decision to infringe instead of to pay public performance royalties in its treatment of Sosa because Sosa was negatively impacting its bottom line.

169.   After executing its blacklisting scheme, Spotify did not generate royalty reports for Sosa from March 2017 forward.

170.   On or about April 2017, Sosa's digital music distributor, Merlin informed Sosa that Spotify was refusing to pay out further royalties to Merlin for the benefit of Sosa as a result of Sosa's alleged misuse of the platform.

171.   On May 23, 2017, in response to Noch's request for Spotify's March 2017 reports for Sosa, Merlin confirmed that it did not have any such reports and then breached its agreement with Sosa by terminating it without any cause.

172.   Since May 2017, the date of Spotify's formal take-down notice, Spotify has continued to reproduce and/or distribute certain of Sosa's works through its interactive streaming service for which Plaintiffs have received **zero compensation**. This conduct is ongoing.

173.   Spotify has streamed Sosa's Repertoire hundreds of thousands of times without ever entering into a license agreement with Plaintiffs for payment of public performance royalties and/or monetarily compensating Plaintiffs for such exploitation.

174.   Spotify concealed the placement of Plaintiffs' music so Plaintiffs would not

discover Spotify's fraudulent scheme.

175.    Spotify never sent accurate or complete accounting statements despite repeated requests for same.

176.    Plaintiffs had to discover for themselves that their music was being exploited on Spotify.

177.    Spotify did not report to Plaintiffs the use and exploitation of their music because Spotify was earning (and continues to) financially benefit from its infringing conduct.

178.    Spotify earns revenue from various forms of advertising. This includes "banner" and "sponsored link" advertising that is placed on Spotify's webpages containing infringing works.

179.    Plaintiffs' music enhances Spotify's reputation and credibility in the industry by having access to music of the kind and quality created by Plaintiffs. Spotify financially benefits from the overall increase in user traffic and commercial value of its business arising from the "draw" of the availability of the infringing works.

180.    Beginning in April 2017, Plaintiffs' legal counsel alerted Spotify to the copyright infringement and requested Spotify take down the works for which Sosa was not receiving payment and for which no license was in place.

181.    In a letter dated August 14, 2018, Plaintiffs' legal counsel again educated Spotify as to its obligations under the Copyright Act with respect to the necessity of purchasing a license for the public performance of musical works in Sosa's Repertoire and attached a copy of PMR's license agreement for execution. Plaintiffs' legal counsel placed

Spotify on notice of an impending lawsuit, stating that if Spotify deliberately chose to continue violating the Copyright Act by publicly performing Sosa's works, litigation in federal court would ensue.

182.    In a follow-up letter to Spotify dated November 11, 2018, Plaintiffs' legal counsel identified numerous musical works for which Plaintiffs had substantial evidence confirming Spotify's copyright infringement and again sought to negotiate a licensing arrangement to avoid litigation.

183.    Despite PMR's persistent efforts, Spotify failed to enter into a license agreement with either Plaintiff.

184.    Upon information and belief, none of the owners of the copyrights of any of the musical works in Sosa's Repertoire has issued a license to Spotify and/or has been monetarily compensated for all views on any musical work.

185.    Plaintiffs allege claims of willful copyright infringement based on Spotify's unauthorized public performance of the over 2,000 works found in the twenty-four (24) registered copyrights identified on Exhibit 1 (the "Schedule") incorporated herein.

186.    Each of the aforementioned musical works has been duly registered with the United States Copyright Office. The corresponding copyright number for each musical work is listed on the Schedule.

**FIRST CAUSE OF ACTION
UNFAIR COMPETITION UNDER THE LANHAM ACT**

187.    Plaintiffs incorporate by reference Paragraphs 1-21 above (explaining the parties' respective businesses); Paragraphs 22-35 (identifying the parties); Paragraphs 36-46 (identifying jurisdictional maters); Paragraphs 47-78 (identifying motive and incentive to

damage Plaintiffs); Paragraphs 79-93 (explaining how Spotify targeted Sosa); Paragraphs 94-128 (explaining Spotify's deceptive and misleading conduct and statements); Paragraphs 129-139 (explaining the inconsistency in Spotify's statements and policies); Paragraphs 140-157 (explaining Spotify's public statements and misrepresentations about Sosa); and Paragraphs 158-179 (explaining Spotify's misconduct).

188.    Under Section 43(a) of 15 U.S.C. § 1125(a),

> [a]ny person who, on or in connection with any goods or services ... uses in commerce any …false or misleading description of fact, or false or misleading representation of fact which ... is likely to deceive as to…commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

189.    Spotify's description of its content removal policies, and other statements identified above, in light of Spotify's actual conduct towards Plaintiffs, were false or misleading to consumers and likely to deceive consumers.

190.    The statements had a tendency to deceive or actually deceived a substantial segment of consumers into believing that Plaintiffs' content had violated Spotify's guidelines (or other published policies) and that is why Sosa's Repertoire was banned from Spotify's platform, when this was not the case.

191.    Plaintiffs were damaged as a result of Spotify's statements and conduct, as Plaintiffs' revenues plummeted during and following the Spotify ban. Moreover, Spotify's statements damaged the good will and positive reputation that Plaintiffs had previously enjoyed with its customers and the general public.

192.    Spotify's treatment of Plaintiffs was unfair, as it singled Plaintiffs out for disparate treatment on the sole or primary basis of an anti-competitive motive.

193.    Due to Spotify's market share, Spotify has the power to effectively cause financial ruin to any artist, record label, distributor, music publishing business or performing rights organization.

194.    Plaintiffs suffered actual damages proximately caused by Spotify's violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

195.    Spotify's unfair competition has damaged Plaintiffs in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

196.    Plaintiffs incorporate by reference Paragraphs 1-21 above (explaining the parties' respective businesses); Paragraphs 22-35 (identifying the parties); Paragraphs 36-46 (identifying jurisdictional maters); Paragraphs 47-78 (identifying motive and incentive to damage Plaintiffs); Paragraphs 79-93 (explaining how Spotify targeted Sosa); Paragraphs 94-128 (explaining Spotify's deceptive and misleading conduct and statements); Paragraphs 129-139 (explaining the inconsistency in Spotify's statements and policies); Paragraphs 140-157 (explaining Spotify's public statements and misrepresentations about Sosa); Paragraphs 158-179 (explaining Spotify's misconduct); and Paragraphs 189-195 (setting forth Spotify's violation of the Lanham Act).

197.    Spotify's actions alleged herein constitute deceptive and unfair trade practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq*.

198.    The parties had a commercial relationship.   Sosa engaged the services of Merlin, who in turn contracted with Spotify, to upload its music onto Spotify's platform. PMR purchased advertising on Spotify's platform directly from Spotify.

199.    Plaintiffs have their headquarters in Florida, acquired the musical works at issue in Florida, and suffered damages, including irreparable harm, as a result of Spotify's wrongful actions, in Florida.

200.    Spotify has an office in Florida, does business in Florida and was engaged in "trade or commerce" under FDUTPA.

201.    Spotify's deceptive and misleading statements caused harm to Plaintiffs, because Plaintiffs expected Spotify to comply with its published policies concerning whether and when it would remove content, and Spotify did not, banning Sosa's Repertoire from its platform for anti-competitive reasons.  Spotify's failure to comply with its promises resulted in the ban and in damages to Plaintiffs.

202.    Spotify's practices are likely to deceive consumers acting reasonably, and have in fact already deceived consumers into believing that Spotify only removes content that violates Spotify's guidelines and/or in certain other limited circumstances, when that is untrue.

203.    Spotify also harmed Plaintiffs by falsely and misleadingly informing consumers that their music had violated Spotify's guidelines and/or any other published policies of Spotify, when that was untrue.

204.    Spotify never informed the public or Plaintiffs that it ever "banned" individuals, artists, companies or users in this manner.

205.    The public has an interest in whether Spotify's statements to the public are misleading and deceptive, particularly as Spotify has a 36% market share of the global streaming market.

206.    Spotify's treatment of Plaintiffs was clearly unfair, as it singled Plaintiffs out for disparate treatment and Spotify had an anti-competitive motive to do so.

207.    Spotify committed unfair methods of competition or unfair or deceptive acts or practices in violation of FDUTPA by engaging in the conduct described above.

208.    Spotify's actions contradicted its published statements concerning content removal as set forth above.

209.    Plaintiffs suffered actual damages proximately caused by Spotify's violation of FDUTPA.

210.    Spotify's unfair trade practices have damaged Plaintiffs in an amount to be determined at trial.

<u>**THIRD CAUSE OF ACTION**</u>
<u>**TORTIOUS INTERFERENCE**</u>

211.    Plaintiffs incorporate by reference Paragraphs 1-21 above (explaining the parties' respective businesses); Paragraphs 22-35 (identifying the parties); Paragraphs 36-46 (identifying jurisdictional maters); Paragraphs 47-78 (identifying motive and incentive to damage Plaintiffs); Paragraphs 79-93 (explaining how Spotify targeted Sosa); Paragraphs 94-128 (explaining Spotify's deceptive and misleading conduct and statements); Paragraphs 129-139 (explaining the inconsistency in Spotify's statements and policies); Paragraphs 140-157 (explaining Spotify's public statements and misrepresentations about Sosa); Paragraph 165-166, 169-172 (identifying Spotify's motive); Paragraphs 189-195 (setting forth Spotify's

violation of the Lanham Act); Paragraphs 197-210 (setting forth Spotify's violation of FDUTPA).

212.   Like other record labels and performing rights organizations, Plaintiffs' respective businesses are heavily dependent upon their visibility on digital music platforms.

213.   Spotify is well aware that Plaintiffs have enforceable contractual relationships with various third parties which have been damaged by Spotify's refusal to host Sosa's Repertoire on its platform.

214.   Spotify told third parties not to work with Sosa, PMR or Noch on any platform and that Plaintiffs had engaged in fraudulent activity.

215.   Third parties relied on Spotify's false representations that Plaintiffs had engaged in fraudulent streaming and ceased working with Plaintiffs.

216.   In removing Sosa's Repertoire from its platform and defaming Plaintiffs to their business partners, Spotify wrongfully and intentionally harmed Plaintiffs' actual and prospective business relationships.

217.   Spotify's conduct was not privileged, justified or excusable.

218.   Spotify's tortious inference with contractual and prospective business relations has damaged Plaintiffs in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT

219.   Plaintiffs incorporate by reference Paragraphs 1-21 above (explaining the parties' respective businesses); Paragraphs 22-35 (identifying the parties); Paragraphs 36-46 (identifying jurisdictional maters); Paragraphs 47-78 (identifying motive and incentive to damage Plaintiffs); Paragraphs 79-93 (explaining how Spotify targeted Sosa); Paragraphs 94-

128 (explaining Spotify's deceptive and misleading conduct and statements); Paragraphs 129-139 (explaining the inconsistency in Spotify's statements and policies); Paragraphs 140-157 (explaining Spotify's public statements and misrepresentations about Sosa); Paragraphs 158-179 (explaining Spotify's misconduct); and Paragraphs 180-186 (explaining Spotify's use of Plaintiffs property without compensation).

220.   At all times material, Plaintiffs conferred a benefit on Spotify, who has knowledge thereof.

221.   At all times material, Spotify knowingly and voluntarily accepted and retains the benefit conferred.

222.   Under the circumstances, it would be inequitable for Spotify to retain the benefit without paying value thereof and there is no adequate available legal remedy.

223.   Spotify's unjust enrichment has damaged Plaintiffs in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**UNFAIR COMPETITION**

224.   Plaintiffs incorporate by reference Paragraphs 1-21 above (explaining the parties' respective businesses); Paragraphs 22-35 (identifying the parties); Paragraphs 36-46 (identifying jurisdictional maters); Paragraphs 47-78 (identifying motive and incentive to damage Plaintiffs); Paragraphs 79-93 (explaining how Spotify targeted Sosa); Paragraphs 94-128 (explaining Spotify's deceptive and misleading conduct and statements); Paragraphs 129-139 (explaining the inconsistency in Spotify's statements and policies); Paragraphs 140-157 (explaining Spotify's public statements and misrepresentations about Sosa); Paragraph 165-166, 169-172 (identifying Spotify's motive); Paragraphs 189-195 (setting forth Spotify's

violation of the Lanham Act); Paragraphs 197-210 (setting forth Spotify's violation of FDUTPA).

225.    Spotify's actions, as alleged above, constitute unfair competition under Florida common law.

226.    Spotify's actions have been willful, deliberate and intended to benefit Spotify at Plaintiffs' expense.

227.    Spotify's unfair competition has damaged Plaintiffs in an amount to be determined at trial.

<u>**SIXTH CAUSE OF ACTION**</u>
<u>**COPYRIGHT INFRINGMENT**</u>

228.    Plaintiffs incorporate by reference Paragraphs 1-21 above (explaining the parties' respective businesses); Paragraphs 22-35 (identifying the parties); Paragraphs 36-46 (identifying jurisdictional maters); Paragraphs 47-78 (identifying motive and incentive to damage Plaintiffs); Paragraph 163-186 (identifying the copyrights and infringement thereof).

229.    Spotify has, without a public performance license, publicly performed and/or publicly distributed Sosa's Repertoire through its interactive web-based streaming service notwithstanding repeated warnings from Plaintiffs that such performance constituted infringement of copyright in violation of 17 U.S.C. § 101, *et seq.*

230.    Each of Spotify's acts on infringement referenced herein was willful within the meaning of 17 U.S.C. § 101, *et seq.*

231.    The specific acts of copyright infringement alleged, as well as Spotify's entire course of conduct, has caused Plaintiffs to incur damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask for an order and judgment against each of the Defendants, on a joint and several basis, as follows:

1.     entering judgment in favor of each Plaintiff and against each Defendant on all Plaintiffs' claims.

2.     awarding Plaintiffs actual, compensatory, statutory and punitive damages, and their costs and attorneys' fees, to the full extent allowed by law and specifically, by the Lanham Act, 15 U.S.C. § 1117 and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*;

3.     finding this to be an exceptional case pursuant to 15 U.S.C. § 1117;

4.     declaring that Defendants have engaged in willful infringement of copyrights in willful violation of the Copyright Act;

5.     declaring that Defendants' actions and practices violate Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.;*

6.     declaring that Defendants are directly liable for copyright infringement; a declaration that Plaintiffs are entitled to receive all revenue associated with all exploitations of infringed works, commencing from the date of judgment and for all amounts not taken into consideration in the judgment;

7.     entering an award of damages pursuant to 17 U.S.C. § 504(b), including actual damages, inclusive of the injury to the market value of Plaintiffs' infringed copyrights, and the profits of Defendants as will be proven at trial or, in the alternative, the maximum amount

of statutory damages pursuant to 17 U.S.C. § 504(c), $150,000.00 for each act of willful infringement with respect to the copyrights involved in the action;

8.  entering an injunction preliminarily and permanently enjoining Defendants and their respective officers, directors, managers, members, partners, employees, servants, agents, successors, affiliates and assigns from further infringement of Plaintiffs' copyrights under 17 U.S.C. § 502 and otherwise assisting, aiding or abetting any other person or entity from violating thereof;

9.  entering an injunction preliminarily and permanently enjoining Defendants and their respective officers, directors, managers, members, partners, employees, servants, agents, successors, affiliates and assigns from violating the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* and otherwise assisting, aiding or abetting any other person or entity from violating thereof;

10.  entering an injunction preliminarily and permanently enjoining Defendants and their respective officers, directors, managers, members, partners, employees, servants, agents, successors, affiliates and assigns from violating the Lanham Act under 15 U.S.C. § 1116 and otherwise assisting, aiding or abetting any other person or entity from violating thereof;

11.  entering an order requiring Defendants to file with the Court and serve on Plaintiffs' counsel within thirty (30) days after entry of any injunction, a report in writing, under oath, setting forth in detail the manner in which Defendants have complied with the Court's orders;

12.    awarding attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and under other applicable law;

13.    awarding restitution and disgorgement and imposing a constructive trust;

14.    awarding Spotify's profits earned by virtue of its wrongful conduct, in an amount that will be proved at trial;

15.    ordering an accounting;

16.    awarding punitive damages;

17.    awarding costs of suit and pre-judgment and post-judgment interest according to law, as applicable;

18.    retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

19.    entering such other and further relief, including legal, statutory and equitable, as this Court may deem just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs Pro Music Rights, LLC and Sosa Entertainment LLC hereby demand a jury trial on all issues triable by a jury.

Dated: November 25, 2019          Respectfully submitted,

        **GORA LLC**

By:   _____
        Sinead Rafferty* (**Trial Counsel**)
        (646) 298-8523
        sinead@goralaw.com
        Richard Gora*
        (203) 424-8021
        rich@goralaw.com
        **Gora LLC**
        2 Corporate Dr., Suite 210
        Trumbull, CT 06611


By:   /s/ Vito M. Roppo_____
        Vito M. Roppo
        Florida Bar No.: 112153
        Colosseum Counsel, PLLC
        3811 Airport Pulling Road N.
        Naples, Florida 34105
        (239) 631-8160
        vito@fightforme.com

        *Pending Admission Pro Hac Vice*

        **ATTORNEYS FOR THE PLAINTIFFS**
        **PRO MUSIC RIGHTS, LLC**
        **SOSA ENTERTAINMENT LLC**