**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| SOSA ENTERTAINMENT LLC,<br><br>　　　Plaintiff,<br><br>　　　　　v.<br><br>SPOTIFY AB, a Swedish Corporation;<br>SPOTIFY USA INC., a Delaware<br>Corporation; SPOTIFY LIMITED, a United<br>Kingdom Corporation; and SPOTIFY<br>TECHNOLOGY S.A., a Luxembourg<br>Corporation,<br><br>　　　Defendants. | Civil Action No. 2:19-cv-00843-FtM-29NPM |
| SPOTIFY AB, and SPOTIFY USA, INC.,<br><br>　　　Counterclaim and Third Party<br>　　　Plaintiffs,<br><br>　　　　　v.<br><br>SOSA ENTERTAINMENT LLC and<br>JAKE P. NOCH,<br><br>　　　Counterclaim Defendant and<br>　　　Third Party Defendant. | |

**SPOTIFY AB & SPOTIFY USA INC.'S**
**FIRST AMENDED COUNTERCLAIMS AND THIRD PARTY COMPLAINT**

Counterclaim and Third Party Plaintiffs, SPOTIFY AB and SPOTIFY USA INC.

(together "Spotify"), by and through their undersigned counsel and pursuant to Federal Rules of

Civil Procedure 13(a), 13(h), 14, and 20, hereby bring their First Amended Counterclaim and

Third Party Complaint against Counterclaim Defendant SOSA ENTERTAINMENT LLC ("Sosa") and Counterclaim-Third Party Defendant JAKE P. NOCH ("Noch").[1]

## PRELIMINARY STATEMENT

1.      Spotify brings these Counterclaims to expose and remedy a multi-year campaign of fraud and harassment directed at Spotify by Jake Noch and the entities he controls. Starting in 2016, Noch designed a scheme to artificially generate hundreds of millions of fraudulent streams on songs he had seeded on Spotify's online music-streaming service. Noch's objective was plain: to manipulate Spotify's system to extract undeserved royalties at the expense of hardworking artists and songwriters.

2.      The evidence of Noch's fraudulent scheme is incontrovertible and includes:

- Blatant signifiers of artificial streaming, including highly irregular sudden spikes of streams to Noch's content, and 99% of streams coming from Spotify's ad-supported service, among other signals (¶¶ 48-101);

- Written communications between a "bot farmer" and Noch, where ***Noch directed the creation of millions of fake Spotify accounts*** to artificially stream Noch's content and generate unearned royalty payments (¶¶ 56-59);

- Noch's decision to title his tracks to circumvent fraud detection and ***to mimic popular song titles***—for example, naming a song "SAD!" in imitation of XXXTentacion's hit—to confuse users and generate undeserved streams (¶ 105).

---

[1] Spotify files this amendment as of right under Federal Rule of Civil Procedure 15(a), which renders moot Noch and Sosa's Omnibus Dispositive Motion to (I) Dismiss Counterclaim Defendant Sosa Entertainment LLC and (II) Strike Third Party Defendant Jake P. Noch., ECF No. 49 (June 15, 2020).

7293472.1

3.      Fortunately, through Spotify's fraud-detection efforts, Noch's scheme unraveled. Beginning in March 2016, Spotify detected unmistakable signs that a significant number of streams of Noch's content was artificial. Spotify's own conclusions about the fraudulent streaming were confirmed when a whistleblower provided Spotify with firsthand, undeniable proof—including written communications between the whistleblower and Noch—that Noch had directed the scheme, including directing the creation of ***millions of fake Spotify accounts*** to artificially stream his own content.

4.      With the damning evidence of Noch's ongoing fraud in hand, Spotify's response was appropriately forceful: Spotify made Noch's content unavailable for further streaming and eventually imposed a ban on all content associated with Noch to prevent his abuse of Spotify's platform and the diversion of royalties from legitimate, hard-working artists.

5.      Undeterred, Noch and Sosa continued their deceitful efforts, including trying to smuggle their content back onto Spotify in violation of Spotify's rules and asserting bogus claims of copyright infringement. Ultimately, Noch orchestrated this lawsuit against Spotify, which asserts yet more baseless claims. Spotify brings these Counterclaims and Third Party Claims to ensure that Noch's fraud is not rewarded and to undo the harm caused by Noch's misdeeds.

## <u>INTRODUCTION</u>

6.      Jake Noch is a fraudster who has engaged in a multi-year campaign to generate artificial streams on Spotify's online music service, scam undeserved payments from Spotify, and gin up bogus claims of copyright infringement after Spotify discovered Noch's scheme and removed his content from its service.

7293472.1

7.     Noch touts himself as a "musical prodigy" who started a "record label" when he was sixteen. In actuality, he has become notorious for unscrupulous dealings and illegal business practices throughout the music industry. Among other schemes, he has been accused of (i) withholding thousands in royalties from artists signed to Sosa, his record label; (ii) falsely reporting hundreds of tracks for copyright infringement on various streaming music platforms when he does not in fact own the rights to that content; (iii) flooding online streaming services with large quantities of useless artificially-created "music" (also known as "AI music") in an effort to make himself look like a legitimate and successful artist and label; (iv) generating artificial streams of his content on streaming services to trigger unearned and undeserved royalty payments; and (v) using various subterfuges to place content on streaming services with the express purpose of setting up meritless copyright infringement lawsuits.

8.     Lately, Noch has been attempting to use the federal courts in his efforts to extract funds from legitimate businesses. In addition to the present suit, Noch's fledgling performing rights organization, Pro Music Rights ("PMR"), launched, and then quickly withdrew, ten copyright infringement actions in the Southern District of New York. Noch asserted similar copyright infringement claims against Spotify in this action but backed down once Spotify exposed the claims as meritless, though he has very recently asserted the same baseless claims in a misguided effort to interfere with Spotify's relationship with Apple. Through PMR, Noch has also filed an antitrust action in the District of Connecticut, in which he lobs baseless claims against virtually the entire online streaming music industry for not taking a license from PMR.

7293472.1

9.     Spotify has been one of Noch's frequent targets, and this case derives from the fraudulent schemes that Noch has, on behalf of both himself and Sosa, directed at Spotify over the course of several years. Beginning in 2015, Noch used his record label, Sosa, to enter into agreements with certain music distributors to deliver his and Sosa's content onto Spotify. Once their content was on Spotify, Noch directed third parties to create millions of fake Spotify accounts, and deployed these fake accounts to artificially stream his and Sosa's content up to hundreds of thousands of times daily, and hundreds of millions of times in total. This artificial streaming was fraud, and it directly violated Spotify's express policies and governing agreements. Noch and Sosa's purpose was plain: to defraud Spotify in an effort to extract unearned royalty payments, deprive legitimate artists of royalties, and deceive Spotify's users about the actual popularity of Noch and Sosa's music.

10.     Spotify's fraud-monitoring team found unmistakable signs that the streams of Noch and Sosa's content had been artificially inflated. In particular, the content at issue was streamed almost exclusively using the ad-supported version of Spotify's service, with irregular spikes in streaming and from abnormal patterns of locations—streaming patterns that, taken together, are highly anomalous and indicative of artificial and fraudulent stream manipulation.

11.     Spotify also received direct confirmation of Noch and Sosa's fraud: one of their agents, whom Noch had directed to create millions of fake Spotify user accounts, decided to blow the whistle on Noch and Sosa's illicit scheme. Noch and Sosa's agent provided precise and contemporaneous information to Spotify about the means Noch and Sosa used to engage in their fraud, and then supplied documentation to support his account. Confirming that this fraudulent activity was being done on behalf of both Noch and Sosa, the documentation that the agent provided included screenshots of Skype conversations between the agent and Noch, who was using a Skype account labeled "Sosa Entertainment LLC" *and* "jake.noch."

12.     For a time, Noch and Sosa's scheme bore fruit, as Spotify inadvertently paid out tens of thousands of dollars in royalties in connection with the fake streams generated as a result of their fraudulent activity.

13.     Following discovery of the fraud, Spotify acted to root out the offending content by removing Noch and Sosa's content and preventing its delivery onto Spotify's platform. Spotify expended considerable time, resources, and manpower to protect its users and safeguard its platform from Noch and Sosa's deceptive tactics. Even then, however, Noch and Sosa were undeterred. After Spotify removed their content, Noch would return, using Sosa to hopscotch from distributor to distributor, adopting aliases and/or renaming or slightly modifying previously removed albums and recordings in the Sosa Repertoire, all in an attempt to trick Spotify and evade its fraud detection systems.

7293472.1

14.     After playing this game of cat-and-mouse for over a year, Spotify decided to issue
policies and protections aimed at identifying Noch and Sosa's content and preventing such
content from going live for streaming on its platform. But not even this stopped Noch and Sosa,
as they continued to manufacture new personas to find other ways onto Spotify's platform in
defiance of Spotify's policies. Spotify continues to expend resources to confront and guard
against Noch and Sosa's fraud to the present day.

15.     Noch and Sosa have caused substantial harm to Spotify, including through their
siphoning of unwarranted royalty payments and by causing Spotify to direct significant time and
expense to detecting and stopping the fraudulent activity. Noch and Sosa's scheme was also
targeted at and harmed Spotify's users in New York and Florida (among other places), who were
deceived about the popularity of Noch and Sosa's content. Spotify brings these counterclaims to
redress the damage caused by Noch and Sosa's deceptive and improper actions, and to protect its
platform and those who use it.

## PARTIES AND JURISDICTION

16.     Defendant and Counterclaim Plaintiff Spotify USA Inc. is a Delaware corporation with
its principal place of business at 4 World Trade Center, 150 Greenwich Street, 62nd Floor, New
York, New York 10007.

17.     Defendant and Counterclaim Plaintiff Spotify AB is a corporation organized under the
laws of Sweden with its principal place of business at Regeringsgatan 19, 111 53 Stockholm,
Sweden.

7293472.1

18.     Plaintiff and Counterclaim Defendant Sosa Entertainment LLC is a limited liability company organized and existing under the laws of Florida, with its principal place of business at 3811 Airport Pulling, STE 203, Naples, Collier County, Florida 34105. Sosa purports to be a record label, distributor, promoter, and music publishing company.

19.     Counterclaim and Third Party Defendant Jake Noch is a natural person and, on information and belief, a resident of the State of Florida.

20.     Sosa is a mere instrumentality, and thus an alter ego of Noch. Noch is Sosa's sole member, and the only natural person Sosa and Noch have identified as having any involvement in Sosa's business dealings with respect to Spotify and the issues raised through this litigation. Noch, as Sosa's sole member, does not distinguish between himself and Sosa in corporate records and external communications. For example, Noch contacted third parties to create fake Spotify accounts using a Skype account labeled "jake.noch" *and* "Sosa Entertainment LLC." Noch uses Sosa as a facade so that he may enter into distributor agreements while secretly intending to siphon royalties from platforms like Spotify through artificial and fraudulent stream manipulation. It would be inequitable for a court to uphold a legal distinction between Noch and Sosa, especially given how Noch uses Sosa as a disguise to commit fraud, various breaches of agreements, and unfair or deceptive practices.

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

22.     This Court has jurisdiction over Spotify's counterclaims against Sosa under Federal Rule of Civil Procedure 13(a) (compulsory counterclaims) and 28 U.S.C. § 1367 (supplemental jurisdiction over counterclaims that are part of the same case or controversy as Plaintiff's claims, over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332).

7293472.1

23.     This Court has jurisdiction over Spotify's counterclaims and third-party claims against Noch under Federal Rules of Civil Procedure 13(h) and 20 (joinder of an additional person as a party to a counterclaim), 14 (third-party claims), and 28 U.S.C. § 1367 (supplemental jurisdiction over third-party claims that are part of the same case or controversy as Plaintiff's claims over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332).

## BACKGROUND

### Services Spotify Provides to Creators and Users

24.     Spotify operates a global streaming service for digital music, podcasts, and videos from creators all over the world. Spotify's users can access and stream the available content through a number of devices, including computers, mobile devices, tablets, speakers, televisions, and cars. Spotify serves a substantial consumer base in the United States, including New York and Florida, which are both states in which Spotify has significant numbers of users.

25.     Spotify provides two main tiers of membership to its users. The first of these tiers is a free-to-the-user version that provides users with reduced listening functionality on certain device types. This version serves users advertisements.

26.     The second tier is a premium, paid-subscription offering that provides users with full listening functionality across all permitted device types. This version allows users to listen to music tracks without advertisements.

27.     To provide users the music on its service, Spotify licenses several sets of separate but conjoined copyrights, including, broadly: (i) copyrights for the sound recordings (or tracks) that are on the service; and (ii) copyrights for the musical works (or compositions) that are embodied in the sound recordings. The copyrights relating to sound recordings are typically held by record labels or independent sound recording artists.

9

28.     Spotify pays a significant portion of its revenue to rights holders for licenses to use copyrighted music. As of December 31, 2019, Spotify has paid over €15B to rights holders since its launch.

29.     Spotify's direct-licensing of sound recordings includes deals with major record labels, digital music distributors, and independent record labels. These include an agreement with Merlin, a digital rights agency that licenses on behalf of its independent label and distributor members, and agreements that cover content received via a number of digital music distributors, which distribute sound recordings to music streaming services on behalf of independent or smaller record labels and recording artists. Record labels and artists typically enter into agreements with these distributors, which allow the labels and/or artists to upload their music to the distributors, and the distributors to act on their behalf by entering into content license agreements for distribution of their music to streaming services such as Spotify. Pursuant to its agreements covering these distributors, Spotify licenses the necessary rights for it and its users to stream those sound recordings on its service.

30.     In addition, Spotify has licenses from each of the leading performing rights organizations ("PROs") to cover the public performance rights for the musical works that underlie the sound recordings. PROs are organizations that help songwriters and publishers get paid for the usage of their music by collecting performance royalties on behalf of these rights holders.

31.     Spotify has public performance licenses from all the leading PROs: Broadcast Music, Inc. ("BMI"), the American Society of Composers, Authors and Publishers ("ASCAP"), the Society of European Stage Authors and Composers ("SESAC"), and Global Music Rights ("GMR").

7293472.1

### *Spotify's Efforts to Combat Fraud*

32.     Unfortunately, there are some individuals who seek to generate artificial streams on Spotify's service to try to obtain more royalty payments than they are actually owed and to make their songs appear more popular than they are. Unscrupulous individuals may be tempted to engage in this wrongful conduct in order to generate publicity and exposure, because they can then claim to the public that they represent heavily streamed and popular artists.

33.     This artificial manipulation of streaming is a type of fraud. It is a major area of concern for Spotify and the music industry as a whole. It affects Spotify's consumers across the country, including Spotify's millions of users in New York and Florida.

34.     Given that fraudulent and artificial stream manipulation implicates the integrity of Spotify's service, Spotify invests heavily in its monitoring efforts. Spotify's anti-fraud and anti-stream manipulation activities are designed to benefit legitimate creators who rely on Spotify for royalties, as well as the users who rely on Spotify's recommendations and the accuracy of its data. Spotify has multiple detection measures in place monitoring consumption, and it actively collaborates with industry partners to tackle the issue of fraudulent and artificial streaming. It currently employs teams that focus solely on detecting, investigating, and mitigating fraudulent activity on Spotify's platform. These teams' responsibilities include running comprehensive analyses on suspected artificial streams in order to inform fair and thoughtful decisions on mitigating and stopping such activity.

11

35.     Spotify also currently employs several other teams that contribute to the company's anti-fraud and anti-stream-manipulation efforts. These teams help ensure the downstream effects of detected artificial streaming activity are minimized as much as possible. Spotify also has a team dedicated to proactive enforcement against such actors to further deter artificial streaming activity.

36.     Spotify further demonstrates its commitment to preventing fraud and stream manipulation in the rules and standards it sets for those seeking access to use its platform. All users who create Spotify accounts for streaming music must agree to Spotify's Terms and Conditions of Use ("Terms of Use"), which, during all relevant periods, expressly prohibited the artificial inflation of streams and the creation of fake accounts for the purpose of artificially inflating streams, among other things. *See* Exhibits A-B, Spotify Terms and Conditions of Use Agreements (2015 and 2017). Noch and Sosa agreed to be bound by the Terms of Use.

37.     Section 8 of the Terms of Use, entitled "User Guidelines," which was in effect in at all relevant times, requires that users "respect Spotify, the owners of the Content, and other users of the Spotify Service" and not "engage in any activity, post any User Content, or register and/or use a username" that, among other things, "***uses automated means to artificially promote content***," "impersonates or misrepresents [the user's] affiliation with another user, person, or entity, or is otherwise ***fraudulent, false, deceptive, or misleading***," or "interferes with or in any way disrupts the Spotify Service."

12

38.    Section 16 of the Terms of Use, entitled "Term and termination," expressly states that "Spotify may terminate the Agreements or suspend [a user's] access to the Spotify Service at any time, including in the event of [the user's] actual or suspected unauthorised use of the Spotify Service and/or Content, or non-compliance with the Agreements." Section 16 further states that "if Spotify suspends [a user's] access to the Spotify Service, [the user] agree[s] that Spotify shall have no liability or responsibility to [the user]."

39.    Section 23 of the Terms of Use, entitled "Indemnification," expressly states that users "agree to indemnify and hold Spotify harmless from and against all damages, losses, and expenses of any kind (including reasonable attorney fees and costs) arising out of or related to: (1) [the user's] breach of the Agreements or any one of them; (2) any User Content [the user] post[s] or otherwise contribute[s]; (3) any activity in which [the user] engages on or through the Spotify Service; and (4) [the user's] violation of any law or the rights of a third party."

40.    Similarly, Spotify requires that content providers and licensors also agree not to engage in fraudulent or artificial streaming activity, and it makes these standards plain through an extensive onboarding and ongoing operational processes. These processes include notifying content providers and licensors of a number of guidelines and policies, including Spotify's Content and Infringement Guidelines, which are provided to Spotify's music and distributor partners as part of their onboarding process and throughout the course of the relationship, such as when the Content and Infringement Guidelines are updated.

41.    Section 3 of the Content and Infringement Guidelines states that "[i]f Spotify detects suspicious streaming activity, including the possible artificial manipulation of streams, it will notify the content provider and may immediately remove the relevant tracks from the service pending investigation."

13

42.     This section further states that "Spotify reserves the right to withhold royalties for streams of content deemed by Spotify to violate this section [3]."

43.     Spotify also offers artists additional tools to develop their audience through its "Spotify for Artists" service. All artists who choose to enjoy this service must agree to the Spotify for Artists Terms and Conditions ("SFA Terms"), which also expressly prohibit the artificial inflation of streams and the creation of fake accounts for the purpose of artificially inflating streams, and fully incorporate the Terms of Use, among other things. Noch and Sosa agreed to be bound by these terms.

44.     In addition to being subject to the full Terms of Use, access to the Spotify for Artists service is only available to persons who meet certain conditions. The SFA Terms expressly state that eligibility for the service is limited to those who have "not have been previously barred from the Service for violating these Agreements or for violating any other agreement to which [they were] a party."

45.     Section 8.8 of the SFA Terms further states that "artificially increasing play count or otherwise manipulating the Services by using a script or automated process" is "not permitted for any reason whatsoever" and "may result in immediate termination or suspension" of the user's Spotify account.

46.     Section 21 of the SFA Terms, entitled "Indemnification" states that users "agree to indemnify and hold Spotify harmless from and against all damages, losses, and expenses of any kind (including reasonable attorney fees and costs) arising out of or related to: (1) [the user's] breach of this Agreements; (2) any User Content; (3) any activity in which [the user] engage[s] on or through the Spotify for Artists Service, including the conduct of [the user's] permitted Account Admins'; and (4) [the user's] violation of any law or the rights of a third party."

14

47.     In addition to all of its policies, Spotify has also signed onto the Anti-Stream

Manipulation Code of Conduct, an industry-wide code which includes guidelines for and

commitment to the prevention of stream manipulation.

**_Noch and Sosa's Fraudulent Scheme to Inflate Stream Counts on Spotify and Divert_**
**_Royalties Away From Legitimate Artists_**

48.     Noch and Sosa have schemed for years to perpetrate a fraud on Spotify, extract unearned

royalty payments, and evade detection. Their scheme includes using various distributors to

deliver content to Spotify, setting up millions of fake Spotify user accounts, and then directing

that those accounts bombard Spotify's platform and artificially stream Noch and Sosa's content.

Spotify has used ongoing diligence and devoted substantial resources to detecting and stopping

Noch and Sosa, yet their fraud has continued as they adopt new aliases, reappear with content

both new and barely modified, and then attempt to repeat the deceptive cycle anew, costing

Spotify money, time, and manpower, harming Spotify's reputation, and negatively impacting

Spotify's users.

Noch and Sosa Direct Artificial and Fraudulent Stream Manipulation of Their Content

49.     Noch and Sosa first sought to deliver their content onto Spotify through a New York-

based independent digital music distribution, publishing, and licensing service that had an

agreement with Spotify to license its members' content for streaming on the Spotify service.

50.     Upon information and belief, Noch, through and on behalf of Sosa, entered into an

agreement with that distributor, one of the purposes of which was for the distributor to make

Noch and Sosa's music content available to Spotify for streaming on its platform.

15

51.     In or around December 2015 to March 2016, five albums associated with Noch, which listed "Sosa" as both the artist and the record label, were delivered to Spotify's platform pursuant to Spotify's agreement with the distributor. Those albums were entitled "M.O.L.L.Y.," "Sosa on da Beat," "Rich Timeline," "Trapland," and "$O$A."

52.     In or around March 2016, analysts from Spotify's Content Insights team detected irregular streaming activity associated with Noch and Sosa's albums. Among other things, Spotify detected that over 99% of the streams of Noch and Sosa's albums showed fairly uniform demographics, coming from users in the United States using the ad-supported version of Spotify (and not the premium version). The albums showed irregular spikes in streaming. For example, the album release entitled "Trapland" generated over two million streams in a very short period of time, which was highly unusual given that Sosa was a relatively unknown artist.

53.     In addition, it was highly anomalous that the overwhelming majority of the streams on these specific albums came from nearly only ad-supported users. This lopsided spread deviates significantly from genuine streaming activity because albums generally receive a more balanced ratio of streams from ad-supported users and premium users.

54.     The irregular streams of this content were doubly suspicious in light of the huge disparity between these albums' stream counts and the stream counts of other albums associated with Sosa delivered via other distributors. For example, the albums "Don't Make Me Catch a Case (No Flockin Remix)" and "TrapBoy#1" had only been streamed approximately a thousand times each—far less than even 1% of the streams of the Sosa content showing suspicious streaming patterns.

7293472.1

55.     In short, the streaming pattern that Spotify observed for Sosa and Noch's content in March 2016 was not consistent with normal and organic streaming activity—it was artificial and fraudulent streaming activity.

<u>One of Noch's Agents Blows the Whistle On Noch and Sosa's Fraudulent Scheme</u>

56.     Spotify's analysis was confirmed in or around June 2016, when Spotify received a tip from a third party whistleblower making clear not only that Noch and Sosa's content had been the subject of a fraudulent streaming campaign, but also that ***Noch was personally responsible for the scheme***. The whistleblower was someone who Noch himself had directed to create fake accounts on Spotify for the specific purpose of generating artificial streams of Sosa and Noch's content.

57.     The whistleblower provided Spotify with detailed information confirming Noch and Sosa's fraudulent scheme. He pointed out that certain tracks with "Sosa" listed as the artist had been streamed ***millions of times*** on Spotify, yet not at all on platforms such as YouTube. The whistleblower also specifically told Spotify that, at Noch's instructions and for Noch's benefit, he had set up fake accounts on Spotify. The purpose of these accounts was to artificially generate streams on Noch and Sosa's tracks. *See* Exhibit C, Whistleblower Communications with Spotify Customer Support.

58.     The third party subsequently backed up his account with screenshots of Skype communications between him and Noch in which Noch specifically instructed the third party to create numerous fake accounts to artificially inflate stream counts for Noch's content. *See* Exhibit D, Full Communications between Noch and Whistleblower. The account that Noch had used to communicate with the third party was labeled "Sosa Entertainment LLC" and "jake.noch."

7293472.1





7293472.1



59.     Those communications show that Noch, on behalf of himself and Sosa, sent the third

party an excel spreadsheet with over ***57,000 fake names***, user names, passwords, emails, and

birthdays, representing fake accounts Noch had already obtained elsewhere, and then told the

third party that he needed ***"millions"*** more of such fake accounts.

7293472.1

60.     After receiving the third party's message, Spotify conducted additional analyses of Noch and Sosa's tracks. Those analyses further confirmed what Spotify had suspected in March and what the third party had reported: that Noch and Sosa's content had been streamed in a manner consistent only with fraudulent and artificial streaming. Spotify then enforced its policies prohibiting artificial streaming and removed the five Sosa-related albums from its service.

61.     Despite Spotify's fraud-detection efforts, and its removal of the offending content, Noch and Sosa's fraudulent scheme had the intended effect: prior to removing the content from Spotify's service, Spotify had already paid out royalties, which, on information and belief, were distributed to Noch and Sosa. Just as Noch and Sosa had planned, through their artificial and fraudulent stream manipulation, they were able to extract unearned and illicit royalty payments from Spotify.

Even After Their Content Is Removed By Spotify, Noch And Sosa Use Alternative Means To Redeliver the Content To Continue Their Fraudulent Scheme

62.     Having pursued their fraudulent activity, and unchastened even though their scheme had been detected and their content had been removed from Spotify, Noch and Sosa continued to seek ways to have their content delivered onto Spotify and then generate artificial and fraudulent streams.

63.     After their initial content deliveries were flagged and removed for fraud, Noch, through and on behalf of Sosa, tried to get content, including albums entitled "Molly$" and "Inglewood Family Gangster Blood (I.F.G.B.)," redelivered to Spotify through other distributors that had licensing agreements with Spotify.

7293472.1

64.     In or around January 2017, Sosa adopted a new alias: "Global Affiliates Music Group." On information and belief, this name change was adopted by Noch and Sosa in part in an effort to avoid having their fraudulent activity detected by Spotify.

65.     In or around March 2017, Noch set his sights on Merlin, an independent digital music licensing service, as another vehicle for getting his and Sosa's content onto Spotify's platform.

66.     In 2017, and up to the present, Spotify and Merlin have had a licensing agreement wherein Merlin licenses to Spotify sound recordings from its affiliated record labels and artists for streaming on Spotify's service. Pursuant to that agreement and the then-current guidelines, Spotify has the right to withhold payment for prohibited artificial or fraudulent streams.

67.     Taking advantage of Spotify's deal with Merlin, Noch used Sosa to enter into a contract with Merlin and, through that agreement, was able to deliver a significant amount of Noch and Sosa-related content onto Spotify. The Sosa-related content that was delivered under Merlin included ***the same five Noch albums that had been previously taken down for fraudulent activity***: "M.O.L.L.Y.," "Sosa on da Beat," "Rich Timeline," "Trapland," and "$O$A." When redelivered via Merlin, each of those albums had calculated modifications to artist names, album titles, or cover art—changes that, on information and belief, were made to attempt to avoid Spotify's detection.

68.     Nearly as soon as this Sosa content was delivered to Spotify under Merlin, Noch and Sosa's artificial and fraudulent stream manipulation on these albums resumed in full force. Streaming of these albums exhibited similar patterns as those Spotify had observed on Noch and Sosa's content in 2016.

21

69.     Specifically, across all the albums, nearly all streams were associated with Spotify's ad-supported membership tier, with highly skewed platform device usage, and from abnormal patterns of locations—streaming patterns that are highly anomalous and indicative of artificial and fraudulent stream manipulation. Notably, analysts at Spotify found that 5,500 "users" streaming one of the Sosa albums "originated" from a small American town with a total population of 10,000. For that album, the stream count jumped from *zero to 749,000 streams* in a span of only two days. In Spotify's experience, such streaming activity—of the same virtually unknown album from a tiny and demographically highly anomalous set of accounts—does not occur organically and is only consistent with artificial and fraudulent stream manipulation by fake (often robot) accounts.

70.     Stream counts on all the Sosa albums shot up by the thousands almost immediately upon release, with some climbing to hundreds of thousands of streams in just two to three days, despite the artists, songwriters, and albums being all but unknown. This pattern is rare for the popularity of the artists on the Sosa albums. Upon information and belief, there was no marketing campaign of any note by Noch and Sosa that could have caused a spike of this magnitude.

71.     For example, the Sosa album "Trapland," which Spotify had removed in 2016 following the discovery of the original fraudulent activity, was redelivered in 2017 through Merlin with an amended title: "Trapland (Remastered)." Spotify's analysis of this album showed a highly irregular spike in streams from *zero to about 400,000* in just a few days for what was a very obscure artist and album release:

7293472.1

**Streaming patterns during March 2017 for the Merlin delivered product "Trapland (Remastered):**



Fig. 1: The above graph shows an unnatural sudden spike in streams on the day the album is delivered to the service for what is an unknown release. The graph also shows subsequent sudden drops and rises, which constitute a completely unnatural listening pattern for such a release.

72.     Additionally, over 99% of the streams were by male users in the United States using the

ad-supported version of Spotify's service:

**Gender (Male) And Product (Free) in "US"  during March 2017 for album "Trapland (Remastered)":**



Fig. 2: 99.5% of the streams were from male users, 99.9% of the streams were from Spotify's ad-supported tier (denoted as the "Free" and "Open" products in the chart), and over 99% of the streams came from users registered in the United States.

23

73.     The high improbability of all of these skewed metrics occurring at the same time creates an undeniable record of artificial streaming. Because of the clear pattern of fraudulent streaming, Spotify took down "Trapland (Remastered)" again in or around March 2017.

74.     A similar story occurred for the album "Sosa on da Beat," which Spotify removed in 2016. Through Merlin, Sosa redelivered that album as two separate singles—"Sosa on the beat 200" and "Sosa on the beat 101."

75.     Spotify's analysis of "Sosa on the beat 200" showed irregular spikes in streams shortly after it was redelivered to Spotify in March 2017. The single sat on the service with near zero streams for over seven days and then suddenly, over two days, the stream count jumped from *zero to about 4,500 streams*:



Streaming patterns during March 2017 for the single "Sosa on da beat 200":

Fig. 3: On March 10, 2017, the track, which was released on March 2, suddenly and inexplicably leapt to about 4,500 streams in just two days.

24

76.     Additionally, over 99% of the streams were by male users in the United States using the ad-supported version of Spotify's service:





Fig. 4: 99.24% of the streams were from Spotify's ad-supported tier (denoted as the "Free" and "Open" products in the chart), 99.2% of the streams were from users registered in the United States, and 99.9% of the streams were from male users.

77.     Spotify's analysis of "Sosa on the beat 101" similarly showed highly irregular spikes in streams. The single sat on the service with near zero streams for over seven days and then suddenly, over **two days** in early March 2017, the stream count jumped from **zero to 7,000 streams**; later that month, the stream count jumped again from around **10,000 to 33,000 streams in a single day**:

7293472.1

**Streaming patterns during both March & April 2017 for the single "Sosa on the Beat 101":**



Fig. 5: From March 2, 2017 to March 7, the track still had no streams. Then on March 9, the stream count suddenly and inexplicably leapt to 7,000 streams in just two days. On March 28, the stream count jumped from about 10,000 streams to 33,000 streams.

78. Additionally, about 96% of the streams were by male users, about 97.4% of the streams were by users in the United States, and the vast majority of streams were on the ad-supported version of Spotify's service:

**Gender And Product (Free) during both March & April 2017 for single "Sosa on the beat 101":**



7293472.1

Fig. 6: Less than 5% of the streams were from Spotify's premium tier as opposed to the ad-supported tier (denoted as the "Free" and "Open" products in the chart), 97.4% of the streams came from users registered in the United States, and 96.3% of the streams were from male users.

79.     All of this provided clear indications of inorganic, artificial streaming activity that

violated Spotify's policies. Acting to enforce those policies and protect itself, its legitimate rights

holder partners, and its users from fraudulent activity, Spotify removed "Sosa on the beat 200" in

March 2017 and removed "Sosa on the beat 101" the following month.

80.     Sosa's album "M.O.L.L.Y." was another album Spotify had removed in 2016 that was

redelivered through Merlin in 2017 with an amended title: "Molly$." In addition, the cover art

changed, and the artist's name was amended from "Sosa" to "$O$A IFGB."



Fig.7: Noch and Sosa made changes to track titles, artist names, and cover art, but the content they delivered was identical to what they had previously delivered to the service.

81.     Spotify's analysis of "Molly$" showed irregular spikes in streams in March 2017. For example, despite having been on the service for over a week with zero streams, over two days that month, the stream count jumped from *zero to 6,000 streams*:

28

**Streams during March 2017 for the single "Molly$":**



Fig. 8: From March 2, 2017 to March 9, the album still had no streams. Then on March 11, the stream count suddenly and inexplicably leapt to almost 6,000 streams in a single day.

82.     Additionally, over 99% of the streams of "Molly$" were by male users in the United

States using the ad-supported version of Spotify's service:

**Gender And Product (Free) during March 2017 for the single "Molly$":**



29

Fig. 9: 99.45% of the streams were from Spotify's ad-supported tier (denoted as the "Free" and "Open" products in the chart), 99.3% of the streams came from users registered in the United States, and 99.7% of the streams came from male users.

83. Because of the clear pattern of fraudulent streaming, Spotify removed "Molly$" again in or around March 2017.

84. The very next month, in April 2017, "Molly$" was delivered once again, this time with the artist changed from "$O$A IFGB" to "SOSA IFGB."

85. Shortly thereafter, Spotify again detected irregular spikes in streams. After two days on the service with no streams, in a single day, the stream count jumped from zero to 15,000 streams:



Fig. 10: After being removed in March and re-released on April 6, 2017, the track leapt to 15,000 streams in one day on April 8 after sitting on the service with no streams for two days.

86. Additionally, nearly all of the streams were by male users in the United States using the ad-supported version of Spotify's service:

7293472.1



Fig. 11: 99.9% of the streams came from male users, 99.9% of the streams came from Spotify's ad-supported tier (denoted as the "Free" and "Open" products in the chart), and 100% of the streams came from users registered in the United States.

87.    Spotify took down "Molly$" for the third time in or around April 2017.

88.    In addition to redelivering and engaging in further artificial streaming of the five Sosa albums that Spotify had removed in 2016, Sosa and Noch also delivered other content in 2017 that was also the subject of artificial and fraudulent stream manipulation. For example, an album called "Brick God 2," with the listed artist as "Brick God Sosa," was delivered to Spotify's platform in or around February 2017. After finding fraudulent streaming activity in connection with that album, Spotify removed it in March 2017.

89.    In or around April 2017, the album was redelivered with the artist's name changed to "SOSA IFGB." Once again, however, Spotify detected unusual and artificial streaming activity with the redelivered album.

31

7293472.1

90.     The pattern was similar to what Spotify had detected with much of the other Sosa content. Spotify's analysis of "Brick God 2" showed irregular spikes in streams. For example, over the course of just two days, the stream count for "Brick God 2" jumped from *zero to 749,000 streams*:

**Streams during April 2017 for Album "Brick God 2":**



Fig. 12: After the album's re-release in April, after being initially removed in March, the stream count jumped to about 749,000 streams in just two days.

91.     Notably, 5,500 "users" streaming "Brick God 2" originated from a small American town with a total population of 10,000. This pattern is highly anomalous and not at all correlated to any possible pattern of genuine streaming activity.

92.     Additionally, 100% of the streams were by male users from the United States using the ad-supported version of Spotify's service:

7293472.1

**Gender And Product (Free) during April 2017 for users streaming album "Brick God 2":**



Fig. 13: 100% of the streams were from male users, 100% of the streams were from Spotify's ad-supported tier (denoted as the "Free" product in the chart), and 100% of the streams were from the United States.

93.     Because of the clear pattern of artificial and fraudulent stream manipulation, Spotify once again took down "Brick God 2" in or around April 2017.

94.     Noch and Sosa's fraudulent conduct was continuous and far-reaching. Over the course of its investigation, Spotify's analyses revealed that Noch and Sosa's manipulation involved ***over a million fake accounts and generated hundreds of millions of fraudulent streams***.

95.     Noch and Sosa's scheme required Spotify to devote a significant amount of employee hours and utilize various analytical methods to detect and address the fraud. ***This was one of the most egregious fraudulent streaming operations from a single rights holder that Spotify had to deal with in its company's history.***

96.     Given the overwhelming evidence and scale of the fraud, which far surpassed the fraudulent and artificial stream manipulation detected in 2016, and following deliberation, Spotify eventually decided in or about March 2017, to take down all content associated with Noch and Sosa in order to protect its users, other artists, and Spotify's own business from Noch and Sosa's wrongful conduct.

7293472.1

97.     As a precaution against further fraud by Noch and Sosa, Spotify instituted a block on artist pages associated with Noch and Sosa, and many of the tracks that were taken down were flagged internally to prevent redelivery of these tracks.

98.     Spotify informed Merlin of its findings related to Noch and Sosa's fraudulent streaming activity and provided Merlin with documentation verifying those findings. In particular, it shared its comprehensive analysis of the streams of Noch and Sosa's content as exhibiting uniform demographics and inexplicable spikes in the number of streams from one day to another. Spotify also shared written correspondence from Noch in which Noch, on behalf of himself and Sosa, confirmed the creation of fraudulent accounts and the use of scripts and other automated processes for the purpose of increasing stream counts.

99.     In June 2017, Merlin responded by informing Spotify that it had terminated its relationship with Sosa because of the actions Noch had taken on Spotify's platform, including the creation of the fraudulent accounts and use of manipulative processes in violation of Spotify's Terms of Use.

100.    Spotify also took steps to disable the fake accounts that had created the fraudulent streams on Noch and Sosa's content.

101.    Unfortunately, despite Spotify's diligent efforts to detect and combat Noch and Sosa's fraud, Spotify had already made royalty payments to licensors based on some of Noch's and Sosa's streaming activity, much of which was due to fraud.

**_Undeterred, Noch and Sosa Use Further Subterfuges to Evade Spotify's Block and Regain Access to Spotify's Platform_**

102.    Despite having been exposed as fraudsters and prevented from delivering content to Spotify, Noch and Sosa's efforts to game Spotify's system and defy Spotify's rules did not stop. In or around December 2018, an analyst in Spotify's New York office discovered that Noch and Sosa were using a new alias ("Pineapple Music") to evade Spotify's fraud detection mechanisms and redeliver their content to the platform.

103.    Further investigation by Spotify revealed even more new aliases being used by or associated with Noch and/or Sosa, including "CAFISHBLUES," "DACAPOCARR00," "FALLACYSONATA," "FORTENA_YT," "QUAVERBEAR," and "Intonation."

104.    Spotify also discovered that Noch and Sosa were using a number of other unscrupulous tactics to inflate the stream counts for the music they were posting using these various aliases and in defiance of Spotify's rules.

105.    One tactic was what is known as "track title parasitism": Noch and Sosa would deliver tracks to Spotify via distributors with the same titles as tracks in recent Top 100 lists in order to misdirect user search results away from music those users actually wanted and to Noch's songs. For example, the song "SAD!" associated with Pineapple Music, one of Noch's aliases, shared the title of a famous track from XXXTentacion. Noch had more of such tracks delivered to Spotify with titles such as "Taki Take"—a song that is nearly identical in name to "Taki Taki," the famous hit recording by DJ Snake, Cardi B, Selena Gomez, and Ozuna.

106.    A second tactic involved developing new ways to deploy fake accounts. Noch and Sosa caused tens of thousands of fake accounts, which had initially been dormant, to immediately follow their content and pages once they went live in order to manufacture an illusion that this content was legitimate and popular.

35

107.    A third tactic involved the continued development of fraudulent aliases and pseudonyms to disguise the origins of the music that was being delivered and to obscure its connection to Noch and Sosa. Indeed, Noch and Sosa grew more sophisticated in this tactic, and began using various aliases on third-party websites and platforms to deepen the artifice.

108.    Noch and Sosa's evolving tactics significantly increased the burden on Spotify in trying to enforce its rules and protect its service and users from deception and low-quality content that it did not want on its platform. Spotify spent considerable time and resources trying to untangle and stop Noch and Sosa's efforts to evade its rules. Through these efforts, Spotify eventually took down Noch and Sosa's content.

109.    Over time, Spotify has improved its fraud response procedures based on what it learned about Noch and Sosa, and has been able to more quickly detect and remove fraudulent content. But even as recently as 2019, however, Spotify was still discovering content that was delivered to the service under Noch's aliases. For example, in July 2019, Spotify discovered another track associated with Noch entitled "Drifting," delivered through another licensor. Spotify responded by taking down that track.

### *Noch and Sosa Threaten Spotify With Baseless Legal Claims*

110.    Unhappy at the discovery of their schemes, Noch and the entities he controls began a pattern of hiring multiple lawyers and law firms to harass Spotify. Each lawyer would contact Spotify and threaten legal action, but would disappear upon learning the full extent of Noch and Sosa's fraud.

7293472.1

111.    For example, in or around 2017, Noch hired a law firm, which began threatening legal action against Spotify for its takedowns of Noch's content. Before substantial discussions began, however, the attorneys mysteriously deactivated their website and stopped contacting Spotify. In or around March 2018, and again in July 2019, Spotify was contacted by two different law firms representing Noch. In both instances, the firms made legal threats, and Spotify responded by offering to allow the attorneys to review the evidence Spotify had of Noch and Sosa's fraudulent conduct. In both instances, Noch's lawyers never took Spotify up on this offer and broke off communication with Spotify without pursuing their threatened claims.

### Noch, Sosa, and PMR Create a New Scheme to Manufacture Claims of Copyright Infringement In An Effort to Extract License Payments

112.    In 2018, Noch launched PMR, his new one-man performing rights organization, and developed new tactics to harass Spotify and other online streaming services. These tactics involved making baseless claims of copyright infringement. For example, Noch began a campaign of sending false takedown notices to Spotify about songs that had been delivered by various third-party distributors, claiming copyright over music that Noch did not actually own, demanding that the tracks be removed from Spotify's service, and threatening legal action for copyright infringement. However, these copyright claims were baseless as, upon information and belief, the distributors had the necessary rights to post the works for streaming on Spotify.

7293472.1

113.     Following that, Noch started using PMR in service of a new tactic: trying to artificially manufacture copyright infringement claims against Spotify. Noch, through one of his record label aliases, would arrange for certain sound recordings to be delivered to Spotify via third-party distributors, only to then turn around and claim that the presence of those same works on Spotify was infringing rights in the underlying musical compositions supposedly held by PMR. To "solve" this self-created infringement, Noch demanded that Spotify take a public performance license from PMR.

114.     In August 2018, Noch's latest lawyer, Rich Gora, sent a letter to Spotify alleging widespread copyright infringement of Noch and PMR's content, but offering no information on what specific works Spotify was allegedly infringing. Mr. Gora's letter nevertheless demanded that Spotify take a license from PMR and attached a form license agreement. In September 2018, Spotify responded by asking Noch and PMR to provide additional information about the allegedly unauthorized content that they believed was on Spotify so that Spotify could evaluate their claims. Mr. Gora did not respond until November 2018, at which time he sent Spotify a letter identifying a number of musical works associated with four bulk copyright registrations.

115.     In response to Mr. Gora's November 2018 letter, Spotify conducted a thorough analysis of the works Mr. Gora had identified. Spotify discovered that all of the allegedly infringed content had been delivered *after* Mr. Gora's initial letter and Spotify's subsequent request for further information. This alone was highly suspicious. It suggested that PMR and Noch were deliberately causing content to be delivered to Spotify through authorized third parties so that they could try to claim that the content was infringing to support their baseless demands that Spotify take a license from PMR.

38

116.     This scheme failed for another reason. As Spotify discovered, the relevant public-performance rights associated with all of the newly delivered content embodying the musical works for which Noch and PMR were claiming infringement were covered by Spotify's agreements with BMI. That was because both Noch (the songwriter listed for these works) and Sosa (the music publisher) were both at that time BMI affiliates who had authorized BMI to license the public-performance rights in their works. As such, PMR and Noch had no valid claim of copyright infringement in the performance of those works on Spotify. Spotify informed Mr. Gora of these facts by letter dated November 19, 2018.

117.     Spotify did not hear from Noch and Sosa again for a year, until Sosa (along with PMR) filed this lawsuit. In the initial Complaint, the plaintiffs did not specifically identify any allegedly infringing works, and instead attached a list of bulk registrations. To the extent Spotify was able to identify particular works associated with those registrations, Spotify's analysis showed that nearly all the tracks associated with those works had been taken down from Spotify as a result of Spotify's ongoing monitoring of Noch and Sosa. Spotify's analysis further showed that the few tracks associated with works that were on Spotify's service had all been properly licensed for public performance through Spotify's agreements with established performance-rights organizations, including ASCAP and BMI.

118.     Spotify's counsel sent a letter to Sosa and PMR's counsel explaining that the copyright infringement claim in the initial Complaint rested on patently false allegations: in particular, Spotify explained, Noch was a BMI member and Sosa was a BMI affiliate, and both had expressly authorized BMI to license the public performance rights to their musical works to Spotify and other streaming services. Thus, through its catalog license with BMI, Spotify was authorized, during all relevant times, to publicly perform Noch and Sosa's musical works.

39

119.    After receiving this letter, Sosa and PMR amended the Complaint to withdraw their copyright infringement claim and to eliminate PMR as a Plaintiff, though the Amended Complaint continues to assert stray (and baseless) allegations that Spotify performed Sosa's works without a public performance license.

120.    Nevertheless, Noch's baseless assertions of copyright infringement did not stop even after Plaintiff withdrew its legal claim in this action. Very recently, Noch has used the same misleading assertions of infringement in a deliberate and wrongful effort to interfere with Spotify's business. On or around May 5, 2020, Noch, on behalf of PMR, sent a notice to Apple alleging that Spotify "willfully" infringed musical works purportedly controlled by PMR. On this basis, Noch demanded that Apple remove Spotify's popular and widely used iOS app from the App Store. Noch's allegations are baseless, as Spotify explained to Apple in response to Noch's notice. Nevertheless, Noch's wrongful assertions of infringement, this time with the intent to persuade a third-party to disrupt Spotify's service, are the latest example of the ongoing pattern of fraudulent and misleading activity that Noch and Sosa have aimed at Spotify and that have now occasioned this Counterclaim and Third-Party Complaint.

***Sosa Sues Spotify And Seeks Damages For Spotify's Efforts To Protect Itself From Noch and Sosa's Fraud***

121.    This lawsuit represents yet another attempt by Noch and Sosa to profit from the fraudulent scheme they perpetrated against Spotify over a number of years. In short, as detailed in Sosa's current First Amended Complaint, Sosa seeks damages from Spotify based on allegations that Spotify removed Sosa's content from its platform, withheld royalty payments supposedly due to Sosa based upon streams of Sosa's content, and informed other industry partners of Sosa's fraud.

122.     In reality, however, as detailed extensively herein, Noch and Sosa directed the fraudulent streaming. Spotify's efforts to protect itself and its customers from Noch's and Sosa's fraudulent activities, including its decision to remove Noch's and Sosa's content from the Spotify platform, to withhold royalty payments for streams generated by fraudulent activities, and to inform content partners of the facts Spotify discovered about Noch and Sosa's fraud, all arise directly from, and are the direct consequences of, Noch and Sosa's fraudulent activity and their violations of Spotify's Terms of Use. Accordingly, Spotify brings these compulsory counterclaims against Sosa under Rule 13(a) and impleads, or in the alternative, joins Noch as a third-party counterclaim defendant pursuant to Rules 14, 13(h), and 20 of the Federal Rules of Civil Procedure.

## FIRST CLAIM FOR RELIEF
### Fraud

123.     Spotify incorporates by reference paragraphs 1-15 (overview of fraud); 16-23 (parties and jurisdiction); 24-47 (Spotify's fraud prevention policies, of which Noch and Sosa were fully aware); 48-55 (Noch and Sosa's fraudulent and artificial stream manipulation in 2016); 56-61 (incontrovertible evidence from whistleblower of Noch and Sosa's fraud and subsequent takedowns); 62-101 (Noch and Sosa's renewed fraud efforts in 2017 and subsequent takedowns); 102-109 (Noch and Sosa's continuous and evolving fraud tactics); and 110-122 (Noch and Sosa's continued bad faith interference with Spotify's business up until the present day).

7293472.1

124.     Noch and Sosa made multiple fraudulent statements and representations, and engaged in fraudulent conduct, at every stage of their interactions with Spotify and participation on Spotify's platform. At all points during their scheme, Noch and Sosa were essentially one and the same, as Noch perpetrated the fraud through Sosa. Noch, as he himself admits, is the sole member of Sosa. Noch and Sosa made the following false representations of fact: (1) through the creation of millions of fake accounts, Noch and Sosa represented to Spotify that such accounts were from legitimate users seeking access to the streamed content; (2) through millions of artificial streams, in clear violation of Spotify's rules and policies, Noch and Sosa represented to Spotify that the streams were legitimate and represented accurate demographic information about the audience for specific tracks; (3) through Noch and Sosa's constant updating of cover art, album and song titles, and track information to avoid Spotify's fraud detection mechanisms, they falsely represented that they were delivering new content, rather than content previously determined to be fraudulent and in violation of Spotify's rules and policies; and (4) through constantly creating new aliases and record labels to evade Spotify's fraud detection mechanisms, Noch and Sosa falsely represented their identities to Spotify.

125.     Noch and Sosa's fraudulent scheme started in at least 2016 and continues to the present day. Each time that Spotify would discover and act to stop one part of the scheme, such as the creation and use of artificial accounts to boost streaming numbers, Noch and Sosa would redirect their efforts to different avenues. In this way, through a series of continuous fraudulent acts, Noch and Sosa perpetrated a comprehensive campaign to defraud Spotify, seek to obtain unwarranted royalty payments, and legitimize their standing as an artist and music label and distributor.

7293472.1

126.    Acting on behalf of himself and Sosa, Noch created hundreds of tracks, some comprised only of artificially generated sound loops, for the purpose of extracting royalties from Spotify, and thus creating an illusion that Sosa was a reputable recording label. Noch then categorized these tracks as part of the "Sosa Repertoire," and through Sosa entered into various agreements with distributors to deliver the content onto Spotify's platform, manufacturing the illusion that Sosa was a legitimate record label, and laying the foundation for the subsequent fraud perpetrated on Spotify.

127.    In or around 2016, Noch, personally and on behalf of Sosa, used a Skype username labeled "Sosa Entertainment LLC" and "jake.noch" to communicate with multiple third parties to orchestrate the creation of millions of fake Spotify accounts. For each account, a name, birthday, and email address was fabricated in order to create the illusion that each account was associated with a real person. Each creation of a fake account, made at Noch's direction and under his control, violated Spotify's rules and policies, and constituted a fraudulent statement and representation to Spotify that the accounts were associated with actual users of Spotify's platform and not mere vessels for fraudulent streaming activity that would be detrimental to Spotify's business and reputation.

128.    Upon gaining access to Spotify's platform, Noch, again acting on his own behalf and that of Sosa, caused these accounts to artificially generate millions of streams of Noch and Sosa's content, causing tremendous increases of thousands of streams within a few days. Each of these artificial streams, in clear violation of Spotify's rules and policies, constitutes a fraudulent statement and representation to Spotify that the streams were from legitimate users seeking to access the streamed content and represented accurate demographic information about the audience for specific tracks.

7293472.1

129.   Initially, Noch was able to slip through Spotify's detection mechanisms and mask his fraudulent intentions by using Sosa to deliver content to Spotify through legitimate distributors. However, once Spotify detected fraudulent streaming patterns and received a tip from a third party confirming Noch's creation of fake accounts, Spotify had to act. Spotify took down the fraudulent content in order to protect its business and the interests of all participants on its platform.

130.   Even after Spotify detected Sosa and Noch's fraudulent scheme and took responsive action, including removing the content that had been fraudulently streamed, Sosa and Noch continued their wrongful conduct by jumping to new distributors, misrepresenting their intentions in order to deceive Spotify and get their content redelivered to Spotify's platform in violation of Spotify's rules. Again, Noch knowingly facilitated the contravention of Spotify's fraud detection efforts by using Sosa as a means to trick distributors into delivering Noch and Sosa's content onto Spotify.

131.   Eventually, Noch and Sosa were able to redeliver onto Spotify, through Merlin, much of the same content that Spotify had previously removed. As part of their scheme, Noch and Sosa tactically made changes to cover art, album titles, artist names, and label names, in order to evade detection by Spotify. Noch added this "updated" information to Sosa's Repertoire, and, through Sosa, sought to conceal the content's true association with Noch. These, too, were fraudulent statements and representations to Spotify.

44

132.    Once they had their content back on Spotify, Noch and Sosa used the same or similar fraudulent and deceptive strategies to generate artificial plays of their tracks and to deceive Spotify and its users. Noch used fake accounts that he had obtained through third parties by using communication methods directly associated with both himself and Sosa. Noch then caused millions of fake Spotify accounts to generate millions of artificial or fraudulent streams in order to extract undeserved royalty payments from Spotify. Each creation of a fake account and fraudulent stream constituted a fraudulent statement and representation to Spotify.

133.    Again, once Spotify detected Noch and Sosa's fraudulent activity and gathered evidence of their fraud, Spotify took down the offending content. In addition, Spotify implemented appropriate blocks on accounts and names associated with Noch and Sosa, and reached out to known distributors of Noch and Sosa's content about the fraudulent activity, in order to proactively curb any further fraudulent activity.

7293472.1

134.    However, to date, and despite various actions by Spotify making clear that fraudulent and manipulative activity was not permitted on its platform, Sosa and Noch have not ceased their behavior. Sosa and Noch continue to have their content delivered onto Spotify by reaching out to even more third-party distributors, misrepresenting themselves as legitimate players in the music industry, in order to enter into membership agreements with these distributors. In each of these instances, Noch has used the same strategy as before: using Sosa to deceive distributors and enter into agreements with them for the sole purpose of delivering content onto Spotify from which to extract unearned royalties. Moreover, Sosa and Noch continue to create various aliases and fake record labels such as "Pineapple Music" to evade detection mechanisms put in place by Spotify. Noch then claims that the alias or label is associated with Sosa in order to create an illusion that Sosa is a more successful and legitimate record label than it actually is. Further, when Noch and Sosa evade Spotify's gatekeeping efforts and successfully plant their content on Spotify, Noch has used the unwelcome content as a basis for manufactured copyright infringement claims against Spotify wherein he claims infringement of works in the "Sosa Repertoire."

135.    Sosa and Noch's fraudulent statements, representations, and conduct, were material in that they were the basis through which Sosa and Noch deceived Spotify, its users, and third party distributors, extracted unearned royalty payments, and interfered with Spotify's services and platform. The fraudulent scheme resulted in hundreds of millions of artificial streams.

136.    Sosa and Noch were fully aware of the fraudulent and deceptive nature of their actions, and acted with scienter and with a specific intent to defraud Spotify. They launched, supervised, and controlled a long-running scheme to deceive Spotify and its users about streaming activity associated with their content for the purpose of extracting unwarranted royalty payments from Spotify, misleading Spotify and its users about the popularity of Sosa and Noch's content, and artificially enhancing their reputation and standing in the music industry. To that end, Noch and Sosa actively enlisted agents to create large numbers of fake accounts on Spotify's service for the purpose of manipulating stream counts, actually directed those accounts to generate millions of fake streams that jeopardized the quality of Spotify's services and its users' experiences, deliberately disguised their connection to content for the purpose of getting it delivered to Spotify in defiance of Spotify's rules and for the purpose of continuing their fraudulent scheme, misrepresented their intentions to various third-party distributors, and harassed Spotify and distributors with manufactured infringement claims based on content that Spotify had actively tried to keep off its platform.

137.    Spotify received direct evidence of Noch's scienter and intent to defraud, including screenshots of Noch himself communicating with a third party for the specific purpose of commissioning, on behalf of himself and of Sosa, "millions" of fake Spotify accounts that were to be used to perpetrate fraudulent streaming of Noch and Sosa's content to the detriment of Spotify and its users.

47

7293472.1

138.    Noch and Sosa knew that artificial manipulation of stream counts was forbidden by Spotify's rules, terms, and policies and would inflict significant harm on Spotify, its users, and all legitimate artists who make use of Spotify's platform. They also knew that Spotify had been taking down their content and blocking their accounts and names on its platform because of their manipulative streaming.

139.    Sosa and Noch intended that Spotify rely on their fraudulent statements, representations, and conduct so that they could continue extracting royalty payments and other benefits through the fraudulent and artificial streams.

140.    Spotify was deceived by Sosa and Noch's concerted efforts to get their content on Spotify through legitimate distributors, mask the fact that the millions of fake accounts were not associated with real people, and continuously modify details associated with the same fraudulent content in order to avoid detection by Spotify.

141.    Spotify relied on Sosa and Noch's fraudulent statements, representations, and conduct, including by making royalty payments for streams resulting from Noch and Sosa's fraudulent activities. This reliance was justifiable because Noch and Sosa used multiple and ever-evolving tactics to conceal the fraud, and used legitimate distributors as "carriers" for their fraudulent content.

142.    Spotify suffered damages due to Sosa and Noch's misrepresentations and fraudulent activities, including lost royalty payments, the time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and the loss of goodwill.

7293472.1

143.     Sosa and Noch's continuous and far-reaching fraud was malicious, wanton, oppressive, reckless, and in willful disregard of Spotify's rights and property interests. In order to punish Sosa and Noch and deter them from engaging in such outrageous conduct in the future, they should be required to pay punitive damages.

## SECOND CLAIM FOR RELIEF
## Fraudulent Concealment

144.     Spotify incorporates by reference paragraphs 1-15 and 123-143 (overview of fraud); 16-23 (parties and jurisdiction); 24-47 (Spotify's fraud prevention policies, of which Noch and Sosa were fully aware); 48-55 (Noch and Sosa's fraudulent and artificial stream manipulation in 2016); 56-61 (incontrovertible evidence from whistleblower of Noch and Sosa's fraud and subsequent takedowns); 62-101 (Noch and Sosa's renewed fraud efforts in 2017 and subsequent takedowns); 102-109 (Noch and Sosa's continuous and evolving fraud tactics); and 110-122 (Noch and Sosa's continued bad faith interference with Spotify's business up until the present day).

49

145.    Noch and Sosa have engaged in multiple instances of fraudulent concealment at every stage of their interactions with and participation on Spotify's platform, despite their duty to disclose the true nature of their fraudulent scheme to Spotify. At all points during their scheme, Noch and Sosa were essentially one and the same, as Noch perpetrated the fraud through Sosa. Noch, as he himself admits, is the sole member of Sosa. Noch and Sosa concealed the following material facts: (1) that millions of accounts made at Noch and Sosa's direction were not associated with legitimate users seeking access to the streamed content; (2) that millions of streams associated with these fake accounts were not legitimate and did not represent accurate demographic information about the audience for specific tracks; (3) that Noch and Sosa's constant changing of cover art, album and song titles, and track information for content already found to be fraudulent was simply an attempt at furthering the scheme despite Spotify's clear efforts to prevent the fraud; and (4) that Noch and Sosa were using fake labels and aliases to deliver more fraudulent content onto Spotify's platform.

146.    Noch and Sosa's fraudulent scheme started in at least 2016 and continues to the present day. Each fraudulent misrepresentation was part of a single campaign to defraud Spotify and legitimize and inflate Sosa and Noch's standing and reputation in the music industry. In this way, through a series of continuous fraudulent acts, Noch and Sosa perpetrated a comprehensive campaign to defraud Spotify, seek to obtain unwarranted royalty payments, and legitimize their standing as an artist and music label and distributor.

7293472.1

147.     Acting on behalf of himself and Sosa, Noch created hundreds of tracks, some comprised only of artificially generated sound loops, for the purpose of extracting royalties from Spotify, and thus creating an illusion that Sosa was a reputable recording label. Noch then categorized these tracks as part of the "Sosa Repertoire," and through Sosa entered into various agreements with distributors to deliver the content onto Spotify's platform, manufacturing the illusion that Sosa was a legitimate record label, and laying the foundation for the subsequent fraud perpetrated on Spotify.

148.     In or around 2016, Noch, personally and on behalf of Sosa, used a Skype username labeled "Sosa Entertainment LLC" and "jake.noch" to communicate with multiple third parties to orchestrate the creation of millions of fake Spotify accounts. For each account, a name, birthday, and email address was fabricated in order to create the illusion that each account was associated with a real person.

149.     Upon gaining access to Spotify's platform, Noch, again acting on his own behalf and that of Sosa, caused these accounts to artificially generate millions of streams of Noch and Sosa's content, causing tremendous increases of thousands of streams within a few days. The artificial nature of the streams and the creation of the fake accounts, both constituting clear violations of Spotify's rules and policies, were deliberately concealed from Spotify. As a result, Spotify was forced to expend tremendous time and resources in order to root out the fraud.

150.    Initially, Noch was able to slip through Spotify's detection mechanisms and mask his fraudulent intentions by using Sosa to deliver content to Spotify through legitimate distributors. However, once Spotify detected fraudulent streaming patterns and received a tip from a third party confirming Noch's creation of fake accounts, Spotify had to act. Spotify took down the fraudulent content in order to protect its business and the interests of all participants on its platform.

151.    Even after Spotify detected Sosa and Noch's fraudulent scheme and took responsive action, including removing the content that had been fraudulently streamed, Sosa and Noch continued their wrongful conduct by jumping to new distributors, misrepresenting their intentions in order to deceive Spotify and get their content redelivered to Spotify's platform in violation of Spotify's rules. Again, Noch knowingly facilitated the contravention of Spotify's fraud detection efforts by using Sosa as a means to trick distributors into delivering Noch and Sosa's content onto Spotify. Sosa and Noch deliberately concealed from Spotify their connections to much of this material and the fact that much of it consisted of the same content that Spotify had previously taken down under its anti-fraud policies.

152.    Once they had their content back on Spotify, Noch and Sosa used the same or similar fraudulent and deceptive strategies to generate artificial plays of their tracks and to deceive Spotify and its users. Noch used fake accounts that he had obtained through third parties by using communication methods directly associated with both himself and Sosa. Noch then caused millions of fake Spotify accounts to generate millions of artificial or fraudulent streams in order to extract undeserved royalty payments from Spotify. As a key part of this scheme, the fact that the accounts were fake and the streams were artificially generated was deliberately concealed from Spotify. As a result, Spotify was forced to expend tremendous time and resources to yet again root out the fraud.

153.    Again, once Spotify detected Noch and Sosa's fraudulent activity and gathered evidence of their fraud, Spotify took down the offending content. In addition, Spotify implemented appropriate blocks on accounts and names associated with Noch and Sosa, and reached out to known distributors of Noch and Sosa's content about the fraudulent activity in order to proactively curb any further fraudulent activity.

154.     However, to date, and despite various actions by Spotify making clear that fraudulent and manipulative activity was not permitted on its platform, Sosa and Noch have not ceased their behavior. Sosa and Noch continue to have their content delivered onto Spotify by reaching out to even more third-party distributors, misrepresenting themselves as legitimate players in the music industry in order to enter into membership agreements with these distributors. In each of these instances, Noch has used the same strategy as before: using Sosa to deceive distributors and enter into agreements with them for the sole purpose of delivering content onto Spotify from which to extract unearned royalties. Moreover, Sosa and Noch continue to create various aliases and fake record labels such as "Pineapple Music" to evade detection mechanisms put in place by Spotify. Noch then claims that the alias or label is associated with Sosa in order to create an illusion that Sosa is a more successful and legitimate record label than it actually is. Further, when Noch and Sosa evade Spotify's gatekeeping efforts and successfully plant their content on Spotify, Noch has used the unwelcome content as a basis for manufactured copyright infringement claims against Spotify wherein he claims infringement of works in the "Sosa Repertoire." Sosa and Noch have deliberately concealed the true nature of these fraudulent tactics from Spotify, which caused Spotify to continue to expend time and resources to root out the fraud again and again.

155.     Noch and Sosa's fraudulent concealment of information related to their scheme, particularly the nature of the fake accounts and fake streams, was material in that it was the basis through which Noch and Sosa deceived Spotify, its users, and various third-party distributors, extracted unearned royalty payments, and interfered with Spotify's services and platform. Noch and Sosa's fraudulent concealment resulted in tens of millions of artificial or invalid streams that were originally recorded by Spotify as legitimate. Despite Spotify's mitigation efforts, Noch and Sosa's deceptive conduct resulted in the payment of unwarranted royalties, in addition to Noch and Sosa's deception of Spotify and its users about the actual popularity of that content.

156.     Noch and Sosa had a duty to disclose the nature of the fake accounts and the fraudulent streams to Spotify. Their duty stemmed, first, from their special knowledge of the fraud, including through Noch's communications with third parties for the creation of millions of fake Spotify accounts.

157.     Noch and Sosa also had a duty to disclose by virtue of their relationships with and deliberate use of Spotify as a host of their content. They contracted with various distributors with the specific purpose of having their content available for streaming on Spotify and other online platforms. Through these agreements, Spotify provided a valuable benefit to Noch and Sosa by hosting and making their content available to its millions of users.

158.     Noch and Sosa's duty to disclose also flowed from Noch's creation and deployment of millions of Spotify accounts on behalf of himself and Sosa. In order to use Spotify, Noch agreed to Spotify's terms and policies, which expressly prohibited manipulative and fraudulent streaming. Additionally, Noch agreed to the same terms when he made use of Spotify For Artists in his efforts to promote himself as a legitimate player in the music industry.

159.     Spotify was deceived by Noch and Sosa's concerted efforts to get their content on Spotify through legitimate distributors, mask the fact that the millions of accounts were not associated with real people, and continuously modify details associated with the same fraudulent content in order to avoid detection by Spotify's algorithms, all part of a scheme to conceal the true nature of the fraudulent operation. Noch and Sosa, who had superior knowledge and a corresponding duty to disclose, failed to do so, causing Spotify tremendous time and expense in detecting and curbing the fraud on its own.

160.     Spotify relied on Noch and Sosa's concealment, including by making royalty payments for streams resulting from Noch and Sosa's fraudulent activities. This reliance was justifiable because Noch used multiple and ever-evolving tactics to conceal the fraud, and used legitimate distributors as "carriers" for his fraudulent content.

161.     Spotify suffered damages due to Noch and Sosa's concealment of their fraudulent activities, including lost royalty payments, the time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and the loss of goodwill.

162.     Noch and Sosa's continuous and far-reaching fraud was malicious, wanton, oppressive, reckless and in willful disregard of Spotify's rights and property interests. In order to punish them and deter them from engaging in such outrageous conduct in the future, Sosa and Noch should be required to pay punitive damages.

7293472.1

## THIRD CLAIM FOR RELIEF
### Breach of Contract

163.    Spotify incorporates by reference paragraphs 1-15 and 123-162 (overview of fraud); 16-23 (parties and jurisdiction); 24-47, 152 (Spotify's fraud prevention policies, of which Noch and Sosa were fully aware, as well as the terms and conditions of use of Spotify's platform, which Noch and Sosa agreed to abide by); 48-55 (Noch and Sosa's breaches in 2016); 56-61 (incontrovertible evidence from whistleblower of Noch and Sosa's breaches); 62-101 (Noch and Sosa's additional breaches in 2017); 102-109 (Noch and Sosa's continuous and evolving fraud tactics and breaches); and 110-122 (Noch and Sosa's continued bad faith interference with Spotify's business up until the present day).

164.    Every Spotify user must accept certain agreements, including Spotify's Terms of Use, before being permitted to use Spotify's platform and services. *See* Exhibits A-B, Spotify Terms and Conditions of Use Agreements (2015 and 2017).

165.    Noch and Sosa, whether directly or through their agents acting under their direction and control, created accounts on Spotify's service for their own benefit. In doing so, Noch and Sosa each agreed to abide, and are bound, by Spotify's Terms of Use.

166.    Spotify's Terms of Use, during all relevant periods, expressly prohibited Noch and Sosa's fraudulent conduct.

7293472.1

167.     In particular, section 8 of the Terms of Use entitled "User Guidelines" requires that users "respect Spotify, the owners of the Content, and other users of the Spotify Service" and not "engage in any activity, post any User Content, or register and/or use a username" that, among other things, "***uses automated means to artificially promote content***"; "impersonates or misrepresents [the user's] affiliation with another user, person, or entity, or is otherwise ***fraudulent, false, deceptive, or misleading***"; or "interferes with or in any way disrupts the Spotify Service."

168.     Noch and Sosa breached the Terms of Use by generating millions of fake accounts and directing those fake accounts to artificially promote content in clear violation of Section 8 of the Terms of Use. Upon information and belief, these fake accounts were created at the direction of Noch and Sosa and for their benefit, and operated under their control for the sole purpose of generating artificial or fraudulent streams on Noch and Sosa's content.

169.     Noch and Sosa also breached the Terms of Use by impersonating real users in their generation of fake accounts in clear violation of Section 8 of the Terms of Use.

170.     Noch and Sosa further breached the Terms of Use by interfering with and disrupting Spotify's services and platform, including by their fraudulent and artificial stream manipulation in clear violation of Section 8 of the Terms of Use.

171.     Spotify has fully performed and not breached any of its obligations to Noch and Sosa under the Terms of Use.

172.     Spotify suffered damages due to Noch and Sosa's breach, including lost royalty payments, the time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and the loss of goodwill.

## FOURTH CLAIM FOR RELIEF
### Indemnification

173.    Spotify incorporates by reference paragraphs 1-15 and 123-162 (overview of fraud); 16-23 (parties and jurisdiction); 24-47, 152 (Spotify's fraud prevention policies, of which Noch and Sosa were fully aware, as well as the terms and conditions of use of Spotify's platform, which Noch and Sosa agreed to abide by); 48-55 (Noch and Sosa's breaches in 2016, as well as additional fraudulent behavior related to its use of Spotify's platform); 56-61 (incontrovertible evidence from whistleblower of Noch and Sosa's breaches); 62-101 (Noch and Sosa's additional breaches in 2017, as well as additional fraudulent behavior related to its use of Spotify's platform); 102-109 (Noch and Sosa's continuous and evolving fraud tactics and breaches); and 110-120 (Noch and Sosa's continued bad faith interference with Spotify's business up until the present day); and 121-122 (Noch and Sosa seek damages based on Spotify's response to their violations of the Terms of Use).

174.    Every Spotify user must accept certain agreements, including Spotify's Terms of Use, before being permitted to use Spotify's platform and services. *See* Exhibits A-B, Spotify Terms and Conditions of Use Agreements (2015 and 2017).

175.    Noch and Sosa, whether directly or through their agents, created accounts on Spotify's service for their own benefit. In doing so, Noch and Sosa each agreed to abide, and are bound, by Spotify's Terms of Use.

7293472.1

176.    Section 23 of the Terms of Use, entitled "Indemnification," expressly states that users "agree to indemnify and hold Spotify harmless from and against all damages, losses, and expenses of any kind (including reasonable attorney fees and costs) arising out of or related to: (1) [the user's] breach of the Agreements or any one of them; (2) any User Content [the user] post[s] or otherwise contribute[s]; (3) any activity in which [the user] engages on or through the Spotify Service; and (4) [the user's]  violation of any law or the rights of a third party."

177.    Spotify's Terms of Use, during all relevant periods, expressly prohibited using automated means to promote content and engaging in other misleading and deceptive behavior.

178.    Sosa and Noch each breached the Terms of Use through the fraudulent and deceptive behavior described above, including by generating fake accounts and directing those accounts to artificially promote content, by impersonating real users in their generation of fake accounts, and by interfering with and disrupting Spotify's services and platform through their artificial inflation of stream counts.

179.    Noch and Sosa breached the Terms of Use by generating millions of fake accounts and directing those fake accounts to artificially promote content in clear violation of Section 8 of the Terms of Use. These fake accounts were created for the sole purpose of generating artificial or fraudulent streams on Noch and Sosa's content on Spotify.

180.    Noch and Sosa breached the Terms of Use by impersonating real users in their generation of fake accounts in clear violation of Section 8 of the Terms of Use.

181.    Noch and Sosa breached the Terms of Use by interfering with and disrupting Spotify's services and their artificial and fraudulent stream manipulation in clear violation of Section 8 of the Terms of Use.

7293472.1

182.     In addition to its breaches of the Terms of Use, Noch and Sosa damaged Spotify by using legitimate distributors to deliver their content onto Spotify so as to extract unearned royalty payments and manufacture infringement claims for extortive purposes.

183.     Spotify suffered damages, losses, and expenses due to Noch's breaches of the Terms of Use, as well as all his improper activity on Spotify's platform, including lost royalty payments, the time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and the loss of goodwill.

184.     Under Section 23 of the Terms of Use, Spotify is entitled to indemnification by Sosa for all of its damages, losses, and expenses stemming from Noch's breaches of the Terms of Use, as well as from Noch's fraudulent and manipulative activity.

185.     Spotify suffered damages, losses, and expenses due to Sosa's breaches of the Terms of Use, as well as its other improper activity on Spotify's platform, including lost royalty payments, the time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and the loss of goodwill.

186.     Under Section 23 of the Terms of Use, Spotify is entitled to indemnification by Noch for all of its damages, losses, and expenses stemming from Sosa's breaches of the Terms of Use, as well as from Sosa's fraudulent and manipulative activity.

7293472.1

187.    Under Section 23 of the Terms of Use, Spotify also is entitled to indemnification by Noch for any damages, losses, or other expenses that Sosa seeks to recover through the First Amended Complaint pursuant to its allegations that Sosa was harmed by Spotify withholding royalty payments, removing Sosa's content from the Spotify platform, and contacting industry partners about Noch and Sosa's fraud.  Each of these allegations is directly tied to Noch's fraudulent and manipulative activity, breach of the Spotify Terms of Use, and Spotify's responses to those breaches, and thus Noch must indemnify Spotify.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**

188.    Spotify incorporates by reference paragraphs 1-15 and 123-162 (overview of fraud); 16-23 (parties and jurisdiction); 24-47 (Spotify's fraud prevention policies, of which Noch and Sosa were fully aware); 48-55 (Noch and Sosa's fraudulent and artificial stream manipulation in 2016 through which Noch and Sosa obtained benefits from Spotify); 56-61 (incontrovertible evidence from whistleblower of Noch and Sosa's fraud and subsequent takedowns); 62-101 (Noch and Sosa's renewed fraud efforts in 2017 through which Noch and Sosa obtained benefits from Spotify, and subsequent takedowns); 102-109 (Noch and Sosa's continuous and evolving fraud tactics); and 110-122 (Noch and Sosa's continued bad faith interference with Spotify's business up until the present day).

189.    Noch and Sosa entered into multiple agreements with various distributors.

190.    Noch and Sosa represented to each distributor that Sosa was a legitimate recording label, and caused the distributors to deliver Noch and Sosa's content to Spotify.

7293472.1

191.    Once Noch and Sosa's content was delivered onto Spotify's platform, they created and deployed millions of fake accounts to generate hundreds of millions of fraudulent streams in order to improperly extract royalties from Spotify. The scope and extent of Noch and Sosa's fraudulent and improper content are alleged in detail above, at paragraphs 48 through 122.

192.    Noch and Sosa were enriched through their access to Spotify's platform. They received royalty payments on their fraudulent streaming activity, and also received other benefits such as exposure and promotion by virtue of their content being available to audiences across the world. They were also able to claim, in their marketing and publicity efforts, that their content was more popular than it actually was.

193.    The enrichment was at Spotify's expense, as Spotify paid out royalties on fraudulent streams engineered by Noch and Sosa as part of their fraudulent and deceptive scheme. Spotify also expended time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and also suffered the loss of goodwill.

194.    Equity and good conscience require that these royalties be returned to Spotify as they were obtained through the fraudulent and deceptive scheme described above and directly at the expense of Spotify.

7293472.1

**SIXTH CLAIM FOR RELIEF**
**Deceptive Business Practices Under New York General Business Law Section 349**

195.    Spotify incorporates by reference paragraphs 1-15 and 123-162 (overview of fraud); 16-23 (parties and jurisdiction); 24-47 (Spotify's fraud prevention policies, of which Noch and Sosa were fully aware); 48-55 (Noch and Sosa's fraudulent and artificial stream manipulation in 2016); 56-61 (incontrovertible evidence from whistleblower of Noch and Sosa's fraud and subsequent takedowns); 62-101 (Noch and Sosa's renewed fraud efforts in 2017 and subsequent takedowns); 102-109 (Noch and Sosa's continuous and evolving fraud tactics); and 110-122 (Noch and Sosa's continued bad faith interference with Spotify's business up until the present day).

196.    Noch and Sosa have orchestrated the creation and deployment of millions of fake accounts to generate hundreds of millions of fraudulent streams. The scope and extent of Noch and Sosa's fraudulent and improper content are alleged in detail above at paragraphs 48 through 122.

197.    Noch and Sosa's misrepresentations and fraudulent conduct were misleading in a material way in that they were the basis through which they deceived Spotify, its users, and third-party distributors, extracted unearned royalty payments, and interfered with Spotify's services and platform. Noch and Sosa's fraudulent scheme resulted in tens of millions of artificial streams that were originally recorded by Spotify as legitimate. Despite Spotify's mitigation efforts, Noch and Sosa's continued deceptive conduct from 2016 onward resulted in the payment of unwarranted royalties, in addition to Noch and Sosa's deception of Spotify and its users about the actual popularity of that content.

64

198.    Spotify suffered damages due to Noch and Sosa's deceptive conduct, including lost royalty payments, the time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and the loss of goodwill.

199.    Noch and Sosa's fraudulent conduct affected consumers who came to Spotify expecting personalized and tailored music and playlist recommendations based on their listening patterns. Fraudulent streaming interferes with Spotify's algorithms and prevents it from being able to deliver content accurately tailored to individual users.

200.    Noch and Sosa's fraudulent conduct also affected consumers who came to Spotify expecting accurate insights into popular music. Fraudulent streaming interferes with Spotify's algorithms and makes it more likely that users will be exposed to content that is not actually popular, and instead is a mere vessel for artificial streaming. Users thus do not receive the quality of service they have signed up for, and Spotify's reputation is tarnished as a result.

201.    The public has an interest in the prevention of the kind of fraud perpetrated by Sosa and Noch, which interferes with the experiences of consumers and prevents them from getting the full benefit of the services they purchase.

7293472.1

202.    At all relevant times, and at present, Spotify's customer base has included millions of users located within New York, and thus the impact of Noch and Sosa's fraudulent activity was felt directly by New York consumers. Noch and Sosa's fraudulent activity interfered with Spotify's algorithms and ability to properly tailor music based on listening patterns for Spotify's New York customers. In addition, Spotify's ability to provide accurate streaming information and music insights was compromised, and this affected Spotify's New York customers as well. The quality of experience for Spotify's New York customers is jeopardized by artificial and fraudulent stream manipulation, and that impact is felt heavily in New York, which is Spotify's U.S. home state and one of Spotify's largest markets.

**SEVENTH CLAIM FOR RELIEF**
**Deceptive and Unfair Trade Practices Under Florida Deceptive and Unfair Trade Practices Act (FDUTPA)**

203.    Spotify incorporates by reference paragraphs 1-15 and 123-162 (overview of fraud); 16-23 (parties and jurisdiction); 24-47 (Spotify's fraud prevention policies, of which Noch and Sosa were fully aware); 48-55 (Noch and Sosa's fraudulent and artificial stream manipulation in 2016); 56-61 (incontrovertible evidence from whistleblower of Noch and Sosa's fraud and subsequent takedowns); 62-101 (Noch and Sosa's renewed fraud efforts in 2017 and subsequent takedowns); 102-109 (Noch and Sosa's continuous and evolving fraud tactics); and 110-122 (Noch and Sosa's continued bad faith interference with Spotify's business up until the present day).

204.    Noch and Sosa engaged in a continuous pattern of unfair and deceptive trade practices by orchestrating the creation and deployment of millions of fake accounts to generate hundreds of millions of fraudulent streams. The scope and extent of Noch and Sosa's fraudulent and improper content are alleged in detail above at paragraphs 48 through 122.

66

205.    Noch and Sosa's unfair and deceptive conduct was the basis through which they deceived Spotify, its users, and third-party distributors, extracted unearned royalty payments from Spotify, and interfered with Spotify's services and platform. Noch and Sosa's fraudulent scheme resulted in tens of millions of artificial streams that were originally recorded by Spotify as legitimate. And despite Spotify's mitigation efforts, Noch and Sosa's continued unfair and deceptive conduct resulted in Spotify's payment of unearned royalties that it would not have otherwise paid out and deceived Spotify and its users about the true popularity of Noch and Sosa's content.

206.    Noch and Sosa's unfair and deceptive conduct directly and proximately caused Spotify to suffer damages, including the payment of unwarranted or misdirected royalties, the time, effort, and manpower associated with its fraud detection, prevention, and mitigation efforts, and the loss of goodwill.

207.    Noch and Sosa's unfair and deceptive conduct also harmed consumers who came to Spotify expecting personalized and tailored music and playlist recommendations based on their listening patterns. The artificial streaming caused by Noch and Sosa interfered with Spotify's algorithms and prevented it from being able to deliver content accurately tailored to individual users.

208.    Noch and Sosa's unfair and deceptive conduct also affected consumers who came to Spotify expecting accurate insights into popular music. The artificial streaming caused by Noch and Sosa interfered with Spotify's algorithms and made it more likely that users were exposed to content that was not actually popular, and instead was artificially and illegitimately propped up. Spotify users thus did not receive the quality of service they signed up for, and Spotify's reputation was tarnished as a result.

209.    The public has an interest in the prevention of the kind of fraud perpetrated by Sosa and Noch, which interferes with the experiences of consumers and prevents them from getting the full benefit of the services they purchase.

210.    At all relevant times, Spotify's customer base included millions of users located within Florida. Noch and Sosa's fraudulent activity interfered with Spotify's algorithms and ability to properly tailor music based on listening patterns for Spotify's Florida customers. In addition, Spotify's ability to provide accurate streaming information and music insights was compromised, and this affected all of Spotify's Florida customers as well. The quality of experience for Spotify's Florida customers is jeopardized by artificial and fraudulent stream manipulation.

## PRAYER FOR RELIEF

WHEREFORE, Spotify respectfully requests the following relief:

(a) Sosa takes nothing by reason of its First Amended Complaint, and that judgment be rendered in favor of Spotify on each of the causes of action asserted against it;

(b) That judgment be rendered against Noch and Sosa on each of the claims asserted against them herein and that Spotify be awarded compensatory damages in favor of Spotify against Noch and Sosa in an amount to be proven at trial, including interest thereon;

(c)  For punitive damages against Noch and Sosa;

(d) That Spotify be awarded its costs and disbursements of suit incurred in defense of this action, including reasonable expert and attorneys' fees;

(e) That Spotify be awarded prejudgment interest;

68

(f) That Noch and Sosa be enjoined from asserting meritless copyright infringement claims against Spotify, directly or indirectly attempting to obtain royalties from Spotify, accessing the Spotify platform in any way, or making baseless assertions of infringement to third parties, business partners, and customers; and

(g) That Spotify be granted such other and further relief as the Court deems fair and proper.

Dated:  July 2, 2020

*/s/ Nathan M. Berman*
Nathan M. Berman
FBN: 0329230
nberman@zuckerman.com
ZUCKERMAN SPAEDER LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, Florida 33602
Telephone: (813) 221-1010

Brian M. Willen, Esq. (admitted *pro hac vice*)
New York State Bar No. 4191730
bwillen@wsgr.com
Eli B. Richlin, Esq. (admitted *pro hac vice*)
New York State Bar No. 4861357
erichlin@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, PC
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022
Telephone: (212) 999-5800

*Counsel for Spotify AB and Spotify USA, Inc.*

7293472.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 2, 2020, I electronically filed the foregoing with the

Clerk of Court by using the Court's CM/ECF system thereby serving all registered users in this

case.

/s/Nathan M. Berman
Nathan M. Berman

7293472.1